[No. 24873. *En Banc.* December 11, 1933.]

THE STATE OF WASHINGTON, *on the Relation of N. D. Showalter, Individually and as Superintendent of Public Instruction, Respondent,* v. F. D. COOK, *as County Assessor for Thurston County, Appellant.*[1]

[1]Reported in 27 P. (2d) 1075.

*Harold P. Troy* and *Smith Troy (McMicken, Ramsey, Rupp & Schweppe,* of counsel), for appellant.

*Preston, Thorgrimson & Turner,* for respondent.

STEINERT, J.—This is an action in mandamus to compel the assessor of Thurston county to compute and extend upon the tax-rolls of that county the total amount of the tax levy as made and certified by the state board of equalization on September 23, 1933. Upon a hearing before the court, and pursuant to its findings and conclusions, a judgment was entered directing the issuance of a peremptory writ commanding the assessor to compute and extend the levy of taxes for state purposes as fixed by the state board of equalization. From that judgment, the assessor has appealed.

The findings made by the court below, concerning which no question is raised here, present the following facts: Appellant is the assessor of Thurston county, and as such is charged by law with the duty of extending and placing upon the tax-rolls the state tax levy made by the state tax commission, sitting as the state board of equalization. We will hereinafter refer to these two bodies as "the tax commission" and "the state board," respectively.

The total assessed valuation of all taxable property in Thurston county, as determined by the assessor and county equalization board, for the year 1933, plus

the county's proportion of the valuation of public utilities as found by the tax commission, was the sum of $12,273,429, and it was so certified to the state board by the assessor.

After receiving the returns of the various county assessors showing the assessed valuations of the property in their respective counties for the year 1933, the state board officially found and determined that all of the property in Thurston county had, for that year, been assessed at thirty-six per cent of its true and fair value in money, and no more; the state board likewise found and determined that the property in all the other counties of the state had been assessed, in varying ratios, at less than fifty per cent of its true and fair value. In equalizing the assessed valuations of the total taxable property in the state, the state board first found and determined its true and fair value in money, and then, for *state* taxation purposes, fixed the assessed valuation of all such property at fifty per cent of such amount. In so equalizing such assessed valuations, the state board fixed the assessed valuation of all taxable property in Thurston county at $17,046,429, which amount the state board duly found was fifty per cent of the true and fair value of such property in money.

On or about September 27, 1933, the state board levied the state tax authorized for 1933, and certified the levy to the state auditor, who, within the time provided by law, transmitted to the assessor a transcript of the proceedings of the state board, specifying the amount to be levied and collected on the county assessment-rolls for state purposes for that year, together with the amount due to each state fund, and unpaid from the county, for taxes levied in the seventh preceding year. The total levy, including an item of $17,603.38 for veterans' compensation and bond re-

tirement, was the sum of $109,840.70. Excluding the item of $17,603.38 for bond retirement, the total levy for *state* tax purposes does not exceed five mills on the valuation made by the state board of all taxable property in Thurston county. Demand was at the same time duly made upon the assessor that he extend the full amount of the levy upon the county tax-rolls.

The assessor refused to adopt the assessed valuation of the property in Thurston county, as determined by the state board as a basis for the levy of the state tax, and refused to extend upon the county tax-rolls the amount of the state tax so levied, but instead, as it is alleged, is about to enter upon the tax-rolls an amount, computed upon the assessors' valuation, equal to five mills for general state purposes and delinquent taxes for the seventh preceding year, and one mill for bond retirement purposes, and no more, with the result that the amount to be extended upon the county tax-rolls by the assessor for general state purposes and for delinquent taxes for the seventh preceding year, will amount to $61,367, and no more. In passing, it may be said that we are not here concerned with the one-mill levy for bond retirement purposes.

The aggregate value of the real and personal property in the thirty-nine counties of the state, as equalized by the various county boards of equalization, is $870,577,482, to which is to be added the sum of $139,-551,312.50, which is the equalized value of steam railroads, electric railways, telegraph lines and private car companies; or a total of $1,010,128,794.50. The aggregate value of all taxable property in the state, as equalized by the state board, is $1,129,926,062. The several counties adopted various ratios of percentage of value, ranging from thirty-six per cent to forty-eight per cent, as a basis of assessment. The ratio adopted in Thurston county was thirty-six per cent of

the true and fair value of the property in money, and as a result of that procedure the amount which the assessor is about to extend for state tax purposes is only 67.043 per cent of the amount found by the state board to be the correct amount, and as levied by it.

The sole question before us is whether taxes for *state* purposes must be computed upon the valuation certified by the assessor or upon that found by the state board.

At this point, it may be desirable and useful to set forth, as briefly as possible, the procedure with reference to assessment and taxation, in so far as it is material and instructive here.

All real property subject to taxation must be listed and assessed in every even-numbered year, with reference to its value on the first day of March of the year in which it is assessed; personal property must be listed and assessed every year with reference to its value as of the same date. Rem. Rev. Stat., §§ 11111 and 11112. The listing and assessment must be completed by May 31st. Rem. Rev. Stat., § 11140. All property must be assessed at fifty per cent of its true and fair value in money, and, in determining the true and fair value of real or personal property, the assessor may not adopt a lower or different standard of value merely because the same is to serve as a basis for taxation. Rem. Rev. Stat., §§ 11135 and 11140. On the first Monday in July, the county board of equalization is required to meet in session and, after examining and comparing the returns of assessment, proceed to equalize the same and forward to the state board a copy of the corrected assessment-rolls. Rem. Rev. Stat., § 11220. This section also provides:

"No taxes, except special taxes, shall be extended upon the tax-rolls until the property valuations are

equalized by the state board of equalization for the purpose of raising the state revenue.''

The powers and duties of the state board are set forth in Rem. Rev. Stat., § 11222, which we quote in full:

''The members of the tax commission shall constitute the state board of equalization; the chairman of the tax commission shall be the president of the board, and the secretary of the tax commission shall be the secretary thereof. The board shall remain in session not to exceed twenty days; it may adjourn from day to day, and employ such clerical assistance as may be deemed necessary to facilitate its labors. The board shall meet annually on the first Tuesday in September at the office of the tax commission, and shall examine and compare the returns of the assessment of the property in the several counties of the state, and the assessment of the property of railroad and telegraph companies, and proceed to equalize the same, so that each county in the state shal [shall] pay its due and just proportion of the taxes for state purposes for such assessment year, according to the ratio the valuation of the property in each county bears to the total valuation of all property in the state.

''First. They shall classify all property, real and personal, and shall raise and lower the valuation of any class of property in any county to a value that shall be equal and uniform, so far as possible, in every part of the state, for the purpose of ascertaining the just amount of tax due from each county for state purposes.

''Second. The secretary shall keep a full record of the proceedings of the board, and the same shall be published annually by the state tax commission.

''Third. They shall have authority to adopt the rules and regulations for the government of the board, and to enforce obedience to its orders in all matters in relation to the returns of county assessments, and the equalization of values by said board.

''The state board of equalization shall levy the state taxes authorized by law: Provided, that the amount

levied in any one year for general state purposes shall not exceed five mills on the dollar of the assessed value of the property of the entire state; and shall apportion the amount of tax for state purposes levied by the board, among the several counties, in proportion to the valuation of the taxable property of the county for the year as equalized by the board.

"Within three days after the completion of the duties hereinabove prescribed, the president and secretary of the board shall certify the record of the proceedings of the board, the tax levies made for the state purposes and the apportionment thereof among the counties, to the state auditor."

Within three days after the receipt of the record of the proceedings of the state board, the state auditor is required to transmit to each county assessor a transcript thereof showing the amount to be levied and collected on his assessment-books for state purposes. Rem. Rev. Stat., § 11223. When the assessor shall have received the report of the state auditor showing the amount of taxes levied for state purposes, it becomes the assessor's duty to compute the required per centum on the assessed value of the property in the county and extend the state taxes on the tax-rolls. Rem. Rev. Stat., § 11224.

On or before January 15th of the year following, the assessor is required to make out and transmit to the state auditor a complete abstract of the tax-rolls showing, among other things, the total amount of taxable property as equalized and the total amount of taxes levied. Rem. Rev: Stat., § 11221. The procedure to be followed by the assessor in determining the rate per cent of taxes is prescribed in Rem. Rev. Stat., § 11235, as follows:

"All taxes shall be levied or voted in specific amounts, and the rate per centum of all taxes for state and county purposes, and purposes of taxing districts coextensive with the county, shall be determined, calcu-

lated and fixed by the county assessors of the respective counties, within the limitations hereinafter prescribed, upon the assessed valuation of the property of the county, as shown by the completed tax-rolls of the county, and the rate per centum of all taxes levied for purposes of taxing districts within any county shall be determined, calculated and fixed by the county assessors of the respective counties, within the limitations hereinafter prescribed, upon the assessed valuation of the property of the taxing districts respectively.''

The assessed value of property is defined in Rem. Rev. Stat., § 11107, as follows:

''The term 'assessed value of property' as used in this act shall be held and construed to mean the aggregate valuation of the property subject to taxation by any taxing district as placed on the last completed and balanced tax rolls of the county preceding the date of any tax levy.''

It will thus be observed, from a reading of the various sections of the revenue law above quoted, that a complete machinery for assessment and taxation has been provided; that the various officers and bodies therein mentioned are constituent parts of that machinery, each vested with certain powers and each charged with distinct and special duties; that the purpose of, and the only limitation to, their combined authority and jurisdiction, so far as the state is concerned, is that all property shall be assessed and taxed upon an equal and uniform basis, and at fifty per cent of its true and fair value in money, to the end that each county in the state shall pay its due and just proportion of the taxes for state purposes.

With this perspective of the procedure for assessment and taxation, together with the powers and duties of the respective taxing bodies, before us, we approach the situation presented in this case.

Prior to 1933, the levies for state purposes were al-

ways within the limit fixed by the statute, and as a consequence the various county assessors have generally, without any question, extended upon their assessment-rolls the full amounts for state levies as certified to them by the state auditor. On the other hand, no question was ever raised by the state board as to the various ratios of percentage of assessment adopted by the various county assessors, because the result, in former years, in no way lessened or encroached upon the amount of tax which the state was to receive for its purposes, under the levies made by the state board.

In 1932, however, the people enacted initiative measure No. 64, known as the "forty-mill limit tax" act, appearing as chapter 4, Laws of 1933, p. 47 (Rem. 1933 Sup., § 11238-1). The passage of that measure immediately presented an acute situation so far as the state's needs and its portion of the tax were concerned. That act provided that the aggregate of all tax levies upon real and personal property

" . . . shall not in any year exceed forty mills on the dollar of assessed valuation, which assessed valuation shall be fifty per cent of the true and fair value of any such property in money, and the levy by the state shall not exceed five mills . . ."

With the passage of that measure, and as a consequence of its limitations, it soon became apparent that, if the ratios of percentage of valuation theretofore employed by the county assessors were continued, only a part of the actual state levies would be extended upon the county tax-rolls. And that is exactly what has happened. In Thurston county, for instance, the result is that, because of the ratio of percentage of valuation adopted by the county, only sixty-seven per cent of the amount of the actual levy made by the state for its purposes will be placed upon the tax-rolls. In this connection, it must be kept in mind that the

state is not attempting to exceed its five-mill limit guaranteed by the existing statute.

To meet the situation thus presented, the state board in regular session proceeded to raise the assessed valuations of property, in all counties alike, to a level of fifty per cent, which is the basis prescribed in initiative measure No. 64, and then to levy, for state purposes, a tax of five mills on the valuation as thus increased. By doing this, the state has accomplished two things: (1) It has equalized the values of property throughout the state, and (2) it has established a new basis, or rather a different basis, upon which its five-mill tax is levied. In so far as the county's ratio of percentage of valuation affects only the county's portion of the total tax, the state has not attempted to interfere.

The question immediately presented here is whether the state, through its state board, had the right to proceed as it did. Were the question one of first impression, it would seemingly, in the light of the authorities upon the subject, present a very difficult problem. But in this state, the question has, we think, been definitely settled in the case of *State ex rel. Thompson v. Nichols,* 29 Wash. 159, 69 Pac. 771, decided as long ago as July 17, 1902.

In that case, the exact question here presented was before the court. The relator there, a taxpayer of Lincoln county, sought to obtain a judgment of the court declaring the act of the state board in raising the total valuation of the taxable property of the state, as shown by the abstracts returned by the various county auditors to the state board, to be null and void. It was alleged in the complaint therein, as a reference to the original record shows, that the state board, having under consideration the returns of the various assessors, had raised and increased the value of the total taxable property of the state, for the purpose of

avoiding the statutory provision that only five mills could be levied upon the taxable property for school needs, and for the further purpose of raising the amount required and desired by the state board for such needs. It was further alleged in the complaint that the relator did not have knowledge, or any means of knowing, of the acts complained of until only a few days prior thereto. It was therefore contended that the acts of the state board were unlawful. Another question was also involved in that case, but with which we are not here concerned.

As a premise to the main question, the court there first pointed out that the legislature, unless inhibited by the constitution, had the power not only to determine the subjects of taxation, but also to prescribe the method of assessment and collection of taxes; that, in the exercise of that power, the legislature had the right to create a state board of equalization and to designate its duties and the manner of performing them. These observations were obviously sound, and we still adhere to that view. We are also of the opinion that, if the constitution as it then stood contained no inhibition against the exercise of such power by the legislature, still less does the constitution, as since amended, contain any such inhibition. We will advert to this again, a little later.

The opinion in the *Nichols* case then refers in detail to many sections of the contemporary revenue law, which was the prototype of, and contained in substance the same provisions as those appearing in, the codified tax revenue law of 1925, from which liberal quotation has already been made herein. Coming to the crux of the matter in the *Nichols* case, the court said, on pp. 171 to 174, as here condensed:

"It will appear from an examination of the provisions of the revenue law above referred to that the

boards of equalization—county and state—are constituent parts of the machinery of taxation, and that each is vested with certain powers, and charged with special duties. It is true that such boards are not specifically provided for, or even mentioned, in the constitution, but it does not follow from that fact that the legislature was without power to create them, and prescribe their powers and duties. . . .

"It is insisted, on the part of the relator, that the powers of the state board are restricted by law to a mere equalization of the aggregate valuation of the property in the several counties, as fixed by the county boards, and that it has no right or power to increase the total valuation of the property of the state so fixed upon it; and it is argued, in effect, that when the state board raised, as it did in this instance, the valuation of the property in some of the counties of the state as returned to it by the respective county auditors, and adopted the valuations returned from other counties as the true and just valuations therein, it failed to exercise its proper functions, and assumed, without authority of law, to act in the capacity of assessor; that if the board deemed it proper and just to raise the valuations in certain counties, and accordingly did so, it was incumbent upon it to decrease the valuations in the remaining counties in an equal amount, because in no other way could equalization be effected at all. . . . [Here follows a discussion of certain cases in other jurisdictions, cited by counsel.]

. . .

"It was held in that case [*State ex rel. Board of Equalization v. Fortune*, 24 Mont. 154, 60 Pac. 1086] that the state board of equalization was without power to change the valuation of any class of property, its authority being limited to raising or lowering the entire assessment of a county. But such is not the case in this state, for our state board is not only authorized, but required, to 'classify all property, real and personal, and to raise and (or) lower the valuation of any class of property in any county to a value that shall be equal and uniform, so far as possible, in every part of the state, for the purpose of ascertaining the just amount due from each county for state purposes.'

§ 60, *supra* [Laws of 1897, p. 164, § 60]. And the records of the proceedings of the board at its 1901 session show that it classified all property in the state, and raised the valuation of certain classes of property in certain counties to such a sum or amount as it deemed necessary to secure an equal and uniform valuation, so far as possible, throughout the state. This it certainly had the right to do, under the statute, and the fact that this act of the board resulted in increasing the aggregate value of all the property in the state, as returned by the county boards, is no argument against its validity. After a careful examination and consideration of the provisions of the revenue laws and the constitution applicable to the question now before us, we are convinced that the contention of the relator now under consideration is clearly untenable.''

This case, from which we have extensively quoted, has never been overruled or distinguished. It was cited with approval in *Grays Harbor Co. v. Grays Harbor County,* 115 Wash. 210, 196 Pac. 589, and in *State ex rel. King County v. Tax Commission,* 174 Wash. 336, 24 P. (2d) 1094.

In *Eldridge v. Bellingham,* 106 Wash. 96, 179 Pac. 109, it was held that any limitation of millage must be considered in connection with the *true* valuation of the property. It is true that, since that decision was rendered, and possibly because of it, the legislature has, by statute, given a definition to the word "valuation" different from that in the decision. In the *Bellingham* case, property was permitted to be taxed on the basis of its *actual* value. By the subsequent statute, as well as by the "forty-mill tax limit" act, property is now to be taxed upon the basis of its *assessed* value. The principle laid down in the *Bellingham* case, however, still obtains: namely, that the assessed value as finally determined is the basis upon which the tax for state purposes is to be computed by the state board.

In the *Nichols* case, *supra,* many of the cases upon which present counsel are now relying were pressed upon the court and were discussed in the opinion, but the court expressly refused to follow them. On the other hand, the following cases, some of which were cited in the *Nichols* case, support the conclusion reached there, and fortify the conclusion that we reach here. *Salt Lake City v. Armstrong,* 15 Utah 472, 49 Pac. 641; *State ex rel. Cunningham v. Thomas,* 16 Utah 86, 50 Pac. 615; *Wallace v. Bullen,* 6 Okla. 17, 52 Pac. 954; on rehearing, 6 Okla. 757, 54 Pac. 974; *Webb v. Renfrew,* 7 Okla. 198, 54 Pac. 448; *Copper Queen Consolidated Mining Co. v. Territorial Board of Equalization,* 9 Ariz. 383, 84 Pac. 511, affirmed in 206 U. S. 474; *Territory v. Board of Supervisors,* 9 Ariz. 405, 84 Pac. 519; *In re McNeal,* 35 Okla. 17, 128 Pac. 285; *People ex rel. Board v. Pitcher,* 61 Colo. 149, 156 Pac. 812, Ann. Cas. 1918D, 1185; *State ex rel. Schoonover v. Stewart,* 89 Mont. 257, 297 Pac. 476.

We have made some mention above of possible constitutional inhibitions. In the *Nichols* case, *supra,* it was held that there were none. At that time, Art. VII, §§ 1 and 2 of the constitution, contained certain provisions with regard to uniformity and equality of taxation. By the fourteenth amendment to the constitution, those provisions were stricken out and others inserted in lieu thereof. Commenting upon the effect of the fourteenth amendment, we said in *State ex rel. Atwood v. Wooster,* 163 Wash. 659, 2 P. (2d) 653:

"So that the legislature, freed from the former limitations, may now determine what property shall be taxed, the different rates upon which different classes of property shall be taxed, and what property shall pay no tax at all, subject only to the limitations found in the new constitutional provisions."

If there were no barriers to the exercise of the state's power to raise the total valuation of property in the state under the provisions of the old constitution, there certainly are none now.

The appellant earnestly contends that the valuation upon which the state levy must be computed is that shown by the "last completed and balanced tax-rolls of the thirty-nine counties next preceding the date of the levy," which, it is contended, means the assessed valuations as originally certified to the state board by the assessor. The state board of equalization is a constituent part of the machinery and process for assessment and taxation, under the statutes herein already referred to. *State ex rel. Thompson v. Nichols, supra; Wallace v. Bullen, supra.* The completed assessment is the result of the progressive and collective judgment of the several assessing and equalizing bodies. Changes may occur in the progress of the procedure, but the final determination of the matter rests with the state board, in the proper exercise of its discretion. *People v. Pitcher, supra.*

Until the assessments made by the county boards have been equalized and determined by the state board, the tax levies can not be extended (Rem. Rev. Stat., § 11220), and, therefore, there can be no "last completed and balanced tax-rolls" until the state board has performed its function. When that function has been performed, the final result becomes the last completed and balanced tax-roll of the county. The levies made by the state, in this case, are upon the basis of the assessments appearing in the tax-rolls as thus finally balanced and completed.

Appellant finally contends that the action of the state board constituted a raise in the valuations of the property of every taxpayer in the state, *without notice.*

There are several answers to this contention. The immediate answer to it is that the contention was disposed of in the *Nichols* case, *supra*. While there was no direct reference to that contention in the opinion, nevertheless the contention was raised in the case and was necessarily disposed of by the decision therein, which sustained the demurrer to the application for writ of review.

But in further answer to this question, it is to be said that the statute does not require that notice be given to the individual taxpayer of the hearing before the state board. The statute fixes the time of such hearing, and the taxpayer must take notice thereof. Rem. Rev. Stat., § 11091, provides that, where the tax commission, sitting as such for the purpose of examining and testing the work of the county assessors and for the discovery of property subject to taxation, raises the valuation of any specific property or adds any particular property to the assessment list, then the tax commission must give notice of such proposed increase or addition, in the manner required by the statute. But, manifestly, that section applies only to the action of the *tax commission* sitting with reference to sporadic cases of individual properties or classes of property, and does not apply to the regular annual session of the state board called and convened for the specific purpose of equalizing the returns of the various county assessors, to the end "that each county in the state shall pay its due and just proportion of the taxes for state purposes for such assessment year." In the absence of any statute requiring notice of such hearing, none need be given. *People v. Pitcher, supra; Bi-Metallic Investment Co. v. State Board of Equalization,* 239 U. S. 441; Cooley on Taxation, 4th Ed., §§ 1127 and 1197.

The final answer to the contention is that the in-

dividual owner is not, in any event, injured or entitled to complain, if the taxing power has been so exercised that his property has not been assessed at more than fifty per cent of its true and fair value, and a tax levied thereon equally and uniformly with other property within the taxing district, and at a rate authorized by law. *Wallace v. Bullen, supra; In re McNeal, supra.*

Under the facts of this case, the only question before us is whether the state board had the right to increase the total assessed valuation of property in the state and to levy, for state purposes, a tax on such increased amount. Whether the individual taxpayer is entitled to relief with reference to the total amount of tax imposed upon his property, will depend upon considerations with which we are not here immediately concerned. We think that the state had such right under its discretionary powers, and therefore conclude that its act is legal and valid.

The judgment is affirmed.

BEALS, C. J., MAIN, MITCHELL, TOLMAN, MILLARD, and BLAKE, JJ., concur.

HOLCOMB, J. (dissenting)—Being unable to concur in the interpretations of the statutes contained in the prevailing opinion, nor the reasons for the result reached, it seems incumbent upon me to briefly set forth my views.

I assent to the statement:

"The passage of that measure [40-Mill Limit Tax, Rem. 1933 Sup., § 11238-1]' immediately presented an acute situation so far as the state's needs and its portion of the tax were concerned."

It does not seem, however, that the situation above mentioned warrants the straining of the powers of the state board of equalization under our taxation acts.

It is doubtless true, also, that the common school finances are in a deplorable condition, which is not for the court to rectify.

No one will dispute that the power of taxation is an attribute of sovereignty residing in the state alone, as decided in *State ex rel. King County v. State Tax Commission*, 174 Wash. 668, 26 P. (2d) 80; nor that it is a legislative power which may be conferred, within constitutional restrictions, by the legislature. The legislature may also delegate to certain instrumentalities the exercise of certain of the legislative powers; but such mandataries are positively controlled and limited by the legislation creating them and prescribing their powers and duties; and if they go beyond that and arrogate to themselves power not intended by the legislature, they act illegally.

Nearly all of the pertinent statutes are correctly set forth in the prevailing opinion, and need not be here repeated.

In construing the legislation involved herein, it is well to recall some elementary principles of statutory construction. Thus, it is well settled that statutes *in pari materia* will be read together and so as to produce as harmonious a system as possible, the presumption being that the new law was enacted with reference to former laws. *White v. North Yakima*, 87 Wash. 191, 151 Pac. 645. This principle has been followed and reaffirmed in eight subsequent cases by this court, to and including *Kruesel v. Collin*, 171 Wash. 200, 17 P. (2d) 854. See, also, *State v. Herr*, 151 Wash. 623, 276 Pac. 870.

Immediately after the decision by this court in *Eldridge v. Bellingham*, 106 Wash. 96, 179 Pac. 109, as mentioned by the majority, the legislature began to make new definitions of "valuation" and of "assessed

valuation," and in § 3, chapter 142, Laws of 1919, p. 392, provided that:

"Whenever any taxing district or the officers thereof shall, pursuant to any provision of law or of its charter or ordinances, levy any tax, the assessed value of the property of such taxing district shall be taken and considered as the taxable value upon which such levy shall be made." Rem. Rev. Stat., § 11228.

The taxation code enacted in 1925 (Laws of 1925, Ex. Ses., p. 227), Rem. Rev. Stat., §11105 *et seq.,* after defining taxing districts and including the state, in § 11107 defined "assessed value of property" as:

"The term 'assessed value of property' as used in this act shall be held and construed to mean the aggregate valuation of the property subject to taxation by any taxing district *as placed on the last completed and balanced tax rolls of the county preceding the date of any tax levy."* (Italics mine.)

The words, "as placed on the last completed and balanced tax rolls of the county preceding the date of any tax levy," are repeated at least twice in subsequent sections.

The state tax commission and the state board of equalization, although composed of the same personnel, are two distinct agencies of the state. Each of them, however, is controlled by the laws that created them, as amended from time to time.

The forty-mill limit law and our present definitions of "taxing districts," "assessing," "assessed value," and "assessed value of the property," as defined in our present statutes, were not in effect at the time of the decision in *State ex rel. Thompson v. Nichols,* so extensively quoted and largely relied upon in the majority opinion. The forty-mill limit law imposes the positive mandate that the aggregate of all of the tax

levies, excepting those for the payment of certain indebtedness,

"  .   .   .   shall not in any year exceed forty mills on the dollar of *assessed valuation, which assessed valuation* shall be fifty per cent of the true and fair value of any such property in money,  .   .   ." (Italics mine.)

What the taxpayers and proponents of that law, who so overwhelmingly enacted it, clearly intended to be a definite and positive limitation and restriction upon all taxing agencies in the state, by this decision proves to be merely an enlargement of the power of the state board of equalization. The taxpayers certainly had the existing taxation laws in mind when proposing and voting for the forty-mill limit law.

What the state board did in 1933 was to reverse the process that had always been followed in, *first* equalizing the property valuations in the several counties for the purpose of making the levy for state purposes. Instead of making the levy for state purposes on "the last completed balanced tax rolls of the thirty-nine counties, *next preceding the date of the state levy,*" as provided in the taxation statutes, it arbitrarily first raised the ratio, as it decided, from about thirty-six per cent in Thurston county and, as it also determined, about forty-eight per cent in other counties, to what it conceived to be fifty per cent, all without actual inspection, and then made the five-mill levy upon those increased valuations. This was not classification and apportionment, but simply an increase, *in solido,* of assessed values in all counties. Such a result will develop into a complete elimination of the forty-mill limit act. It will be so easily evaded as to be wholly ineffectual.

This question is *res integra* here. It is not controlled by previous decisions under former legislation.

The judgment in this case should be reversed, and a judgment directed in favor of appellant.

For the foregoing reasons, I dissent.

GERAGHTY, J., concurs with HOLCOMB, J.