[Civ. No. 27977. Second Dist., Div. One. Aug. 31, 1964.]

WANDA LEE KNIGHT HANKS, Plaintiff and Appellant,
v. STATE BOARD OF EQUALIZATION, Defendant
and Respondent.

Stanley Milton Sapiro, R. Edward Brown and Leon J. Garrie for Plaintiff and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Dan Kaufmann, Assistant Attorney General, and Richard S. Cohen, Deputy Attorney General, for Defendant and Respondent.

LILLIE, J.—This case is companion to *Michels* v. *Watson,* *ante,* p. 404 [40 Cal.Rptr. 464] 2d Civil No. 27835, this day decided. Plaintiff, a taxpayer and owner of a single family residence, filed a petition for writ of mandate to require defendant State Board of Equalization to increase assessment rolls of all counties of the state for 1962-63 and 1963-64 fiscal years, and all future years, to make them conform to full cash value. No oral proceedings other than argument were had in the trial court; however, introduced as Exhibit 1 was a release of the State Board of Equalization, dated September 11, 1962, setting out the average assessment levels of each county and showing statewide averages for 1960, 1961 and 1962, to be 22.6, 23.5 and 23.8 per cent of true value, respectively. The trial court found that during 1960, 1961 and 1962, no assessed valuation in the state was at 100 per cent of full cash value and assessors throughout the state

were using full cash value as a base or standard for assessments and were applying a ratio to full cash value in order to arrive at assessed valuation (Finding of Fact, No. I) ; and that defendant board intends to leave assessment of property at a fraction or ratio of full cash value provided said fraction or ratio is consistent throughout the state as determined by defendant board pursuant to article I, chapter 2, part 3, division 1, Revenue and Taxation Code (Findings Nos. III, IV). The court concluded that in performing its intercounty equalization functions and its statewide assessment functions, defendant board did not act wilfully, arbitrarily or capriciously, and that the process of assessing property by the use of its full cash value as a standard or base and applying a common ratio to full cash value of the property does not violate constitutional or statutory provisions dealing with local assessments of property, equalization of local assessments, statewide assessments or intercounty equalization. Plaintiff appeals from the judgment entered in favor of defendant.

The sole issue is whether article XIII, section 9, California Constitution, compels the State Board of Equalization to raise assessments to conform to full cash value. Appellant argues that all assessments for property tax purposes must be made at 100 per cent of market value, and that a uniform fraction or ratio of market value cannot be used either in the assessment or equalization process; and contends that defendant board has a duty under the Constitution (art. XIII, § 9) to cause the assessment rolls of each county to be raised to 100 per cent of market value. Defendant board denies it has such a constitutional duty; it claims that under constitutional and statutory provisions in this state, property tax assessments may be made at a ratio or fraction of market value; and that in performing its intercounty equalization functions it is not required to raise or lower a county roll unless the fraction or ratio of the county is inconsistent with the statewide average as determined by it pursuant to sections 1815-1825, Revenue and Taxation Code. Its position is that if it follows this approach it will have equalized the valuation of the taxable property in the several counties and that assessments throughout the state will conform to the true value in money of property contained on the assessment rolls.

Applicable are the following constitutional and statutory provisions:

Article XIII, section 1, California Constitution, adopted in 1879 (previously contained in Const. of 1849, art. XI, § 13) :

''All property in the State . . . shall be taxed in proportion to its value, to be ascertained as provided by law, or as hereinafter provided. . . .''

Article XIII, section 9, creates a State Board of Equalization and constitutes the Boards of Supervisors of the several counties to be Boards of Equalization of their respective counties; and sets forth their powers and duties. It provides that it shall be the *"duty"* of the State Board ''to equalize the valuation of the taxable property in the several counties of the State for the purpose of taxation,'' and the *"duty"* of the county boards ''to equalize the valuation of the taxable property in the county for the purpose of taxation; provided, such state and county boards of equalization are hereby *authorized* and *empowered* . . . to increase or lower the entire assessment roll, or any assessment contained therein, so as to equalize the assessment of the property contained in said assessment roll, and make the assessment conform to the true value in money of the property contained in said roll; . . .'' (Italics added.)

Article XI, section 12, in pertinent part provides: ''All property subject to taxation shall be assessed for taxation at its full cash value.'' Similar, is section 401, Revenue and Taxation Code: ''Except as provided in this part, all taxable property shall be assessed at its full cash value.'' Section 110, Revenue and Taxation Code, defines ''value,'' ''full cash value,'' or ''cash value'' as being ''the amount at which property would be taken in payment of a just debt from a solvent debtor. . . .''

█ A review of the history and development of the law dealing with local property taxation reflects the early-established pattern of assessment of property for purposes of taxation and equalization of assessments in this state; it exists the same today—each county assessor makes the initial assessment, each county board equalizes assessments within the county, and the state board equalizes the assessment rolls among the counties. Appellant's basic argument is that since all assessment for property tax purposes must be made at 100 per cent of market value, a uniform fraction or ratio of market value cannot be used in the process of equalization of assessments.

Relative to the validity of the assessment process, we have held in *Michels* v. *Watson,* that section 12, article XI, California Constitution, does not prohibit the assessment of taxable property by a county at a uniform fraction or ratio of its

full cash or market value. This conforms to the long-established practice of those charged with the administration of our revenue law, sanctioned by the legislature and recognized and accepted by our courts (see cases cited in *Michels* v. *Watson*). Since 1872, first under section 3627, Political Code, then section 3627, and article XI, section 12, California Constitution, and now under article XI, section 12 and section 401, Revenue and Taxation Code, county assessors in this state have not assessed property for general tax purposes at 100 per cent of full cash value; it has been and now is their practice to determine the market value of the property subject to taxation and apply to that value a common ratio. (See annual report to the Governor by the State Board of Equalization, December 31, 1963.)

Our determination of the issue whether defendant board has a constitutional duty to raise or lower county assessment rolls to make them conform to 100 per cent of full cash value, is controlled by article XIII, section 9, California Constitution. The state board's duty to equalize the level of assessments in the various counties throughout the state is derived from section 9, article XIII. (*McDougall* v. *County of Marin,* 208 Cal.App.2d 65, 70 [25 Cal.Rptr. 107]; *Baldwin* v. *Ellis,* 68 Cal. 495 [9 P. 652].) In 1879 this constitutional provision created the state and local boards of equalization and expressed their duties and powers. Thereunder, the state board has the ''duty . . . to equalize the valuation of the taxable property in the several counties of the State for the purposes of taxation''; and is ''authorized and empowered . . . to increase or lower the entire assessment roll, or any assessment contained therein, so as to equalize the assessment of the property contained in said assessment roll, and make the assessment conform to the true value in money of the property contained in said roll, . . .'' Thus, the only expressed constitutional duty of the state board is to equalize the valuation of taxable property in the counties of the state (art. XIII, § 9). This duty is not set up in terms of equalizing at 100 per cent of market value, nor is the state board's power to increase or lower the assessment roll so as to equalize the assessment and make it ''conform'' to the true value in money of the property contained in the roll. If the state board is required under article XIII, section 9, to lower or raise a roll to 100 per cent of market value, as urged by appellant, why then is the state board, in addition, separately but in the same constitutional provision, given the duty and power to

equalize; for if 100 per cent of market value (true value in money) must be used, then equality and uniformity are automatically produced by raising or lowering rolls to 100 per cent of market value. Of what purpose then is the duty or power of the board to equalize? It is exactly what the name implies—"to equalize the assessment of taxes in the several counties, so as to cause them to approximate as nearly as possible to the equality and uniformity enjoined by the Constitution." (*Savings & Loan Society* v. *Austin* (1873) 46 Cal. 415, 473.) "To equalize," the court said in *Wells Fargo & Co.* v. *Board of Equalization* (1880) 56 Cal. 194, at page 196, "is to make equal, to cause to correspond, or be like in amount or degree, *as compared with something.*" Moreover, if the language used in article XIII, section 9, and in article XI, section 12, was intended to mean that all property had to be assessed at 100 per cent of market value, the state board would not need the power to make the rolls or assessments conform to cash value because it would be bound by the 100 per cent requirement. ▇ Thus, the inference is fair that article XIII, section 9, was intended to permit the state board to equalize on the basis of fractional assessments to full cash value.

Appellant relies on *People* v. *Dunn* (1881) 59 Cal. 328, and *Baldwin* v. *Ellis* (1886) 68 Cal. 495 [9 P. 652]. Judge Thornton's concurring opinion in *Wells Fargo & Co.* v. *State Board of Equalization* (1880) 56 Cal. 194, 202, also cited by appellant, discusses a "standard of valuation." In turn, it was relied upon in *People* v. *Dunn* (1881) 59 Cal. 328, in which the court said that the object of the Constitution is that assessments "shall be to accord with the true value in money." (P. 330.) However, in discussing the authority and power of the state board to increase or lower the roll, it asked: "But to what standard?"; its answer was, "So as to equalize it, and make the assessment conform to the (true) value in money of the property contained in the roll." (P. 331.) The court in *Baldwin* v. *Ellis*, 68 Cal. 495 [9 P. 652], equated true value in money with full cash value and held that there was but one standard for state and local purposes. Both the *Dunn* and *Baldwin* case dealt primarily with the power of the state board. As to its duty the court in *People* v. *Dunn* (1881) 59 Cal. 328, said at page 333: ". . . equalization by the Board of Supervisors shall conclusively determine that all individual assessments within the county have been made . . . relatively to each other . . . equal and uniform . . . leaving to the State Board simply the task of equalizing assessments as between

the several counties." The court's main concern was with equality and uniformity in taxation. Under these cases the standard of true value was but a means of realizing uniformity and equality.

 If appellant's contention is correct, the word "conform" employed in article XIII, section 9, in the phrase "conform to the true value in money of the property contained in the roll" and used by the court in relation to "standard" of valuation (see concurring opinion in *Wells Fargo & Co.* v. *State Board of Equalization* (1880) 56 Cal. 194, 220, and *People* v. *Dunn* (1881) 59 Cal. 328, 331), must mean "identical to" or "the same as." "Conform" has been defined differently by the Supreme Court. In *De Leonis* v. *Etchepare* (1898) 120 Cal. 407 [52 P. 718], it construed the requirement of section 540, Code of Civil Procedure, that the amount stated in a writ of attachment " 'must be stated in conformity with the complaint' " (p. 415) as not to necessitate that the amounts so stated shall be identical. It said at page 415: "But did the legislature mean by the words, 'the amount of which must be stated in conformity with the complaint,' that it must be the same identical amount alleged in the complaint to be due? If that was the intention, why not have said: 'The amount of which shall be that stated in the complaint?' . . . The word 'conform' is not the equivalent of 'identical,' or of 'the same.' . . . . This word [conform] is usually followed by 'to' or 'with,' and is frequently qualified by the word 'perfect,' without which qualification identity is not indicated." See also *Finch* v. *McVean,* 6 Cal.App. 272, 274 [91 P. 1019]; *City & County of San Francisco* v. *Boyd,* 22 Cal.2d 685 [140 P.2d 666].) No such qualification appears in article XIII, section 9. Accordingly, had it been the intention of the framers of the Constitution that an assessment made "to conform to the true value in money of the property" must be made in the same identical amount as that of the true value in money of the property, why not have said that the state board is empowered "to increase or lower the entire assessment roll, or any assessment contained therein, so as to equalize the assessment of the property contained in said assessment roll, and make the assessment *the amount of which is* the true value in money of the property contained in said roll"? The word "conform" is commonly used as, and is defined in Webster's Standard International Dictionary, 1961, at page 472, ". . . to bring into harmony or agreement . . . ." Again, if the word "conform" means that a roll must be

raised or lowered to 100 per cent of market value, the additional duty and power to equalize given to the state board in article XIII, section 9, would be meaningless. Such construction would also be out of harmony with section 1, article XIII, providing that all property shall be taxed in proportion to its value. (*Galvin* v. *Board of Supervisors*, 195 Cal. 686, 692 [235 P. 450].) Article XIII, section 9, must be construed to give effect to and be consistent with other constitutional provisions. (*Hyatt* v. *Allen* (1880) 54 Cal. 353, 357; *People* v. *Zolotoff*, 48 Cal.App.2d 360, 364 [119 P.2d 745].)

The Legislature, too, has followed the interpretation of the language used in article XIII, section 9, as intended to permit the state board to equalize on the basis of fractional assessments to full cash value, by adopting a procedure by which the State Board shall accomplish inter-county equalization. (Rev. and Tax. Code, §§ 1815, 1825.)

Language identical to that providing for the power of the state board is used in article XIII, section 9, California Constitution in describing the local boards' powers with respect to the equalization of individual assessments within the county. In most of the cases cited in *Michels* v. *Wilson* (in particular, see *Michael Todd Co.* v. *County of Los Angeles*, 57 Cal.2d 684, 697 [21 Cal.Rptr. 604, 371 P.2d 340]; *A. F. Gilmore Co.* v. *County of Los Angeles*, 186 Cal.App.2d 471, 474-477 [9 Cal. Rptr. 67]) in which the court recognized and discussed the ratio of assessed value on the local roll to market value, the county boards of equalization were therein exercising their powers under section 9, article XIII. In light of the recognition by the court that a ratio was being used, it is reasonable to conclude that the courts were also recognizing that the county boards, in fulfilling their functions under the Constitution, were not required to raise or lower a local assessment to 100 per cent of market value.

It should also be noted that 10 years after *Wells Fargo & Co.* v. *Board of Equalization* (1880) 56 Cal. 194, and *People* v. *Dunn* (1881) 59 Cal. 328, the Supreme Court acknowledged and accepted the fact that assessed valuation (the figure appearing on the assessment roll for property tax purposes) is not equivalent to the market value of the property, and for that reason held that the assessed valuation of land was inadmissible to show market value in a condemnation proceeding. (*San Jose & Almaden R. R. Co.* v. *Mayne* (1890) 83 Cal. 566 [23 P. 522].) In 1960 the court continued to recognize that assessed valuation is not the same as market value. (*Pearson*

v. *State Social Welfare Board*, 54 Cal.2d 184 [5 Cal.Rptr. 553, 353 P.2d 33].) ■■ Further, it appears from the cases cited in *Michels* v. *Watson*, that when our courts, during the period between 1890 and the present, refer to ''market value'' as the standard for assessment and equalization, acknowledging that a uniform ratio is being applied to that standard, they use the term in the ordinary sense that ''market value'' is the criterion or test, and that it is not necessary in meeting this standard that it be at 100 per cent of market value. Equality and uniformity in the imposition of the burden of taxation upon property throughout the state, and that all property be taxed in proportion to its value to be ascertained as directed by law, have always been the dominant goals of the Constitution in the field of taxation; and the evil that the State Board of Equalization was created to remedy was inequality and lack of uniformity producing discriminatory underassessment. (*Savings & Loan Society* v. *Austin*, 46 Cal. 415, 474-475.) ■■ The fundamental and consistent interest of our courts in construing the constitutional and statutory tax provisions has been in the equality and uniformity of the tax burden and accordingly, have recognized that this is achieved by the long-employed practice of using market value as a standard and applying a uniform fraction to that standard. (*Rittersbacher* v. *Board of Supervisors*, 220 Cal. 535 [32 P.2d 135].)

Appellant argues that the early struggle for equality and uniformity of taxation in California resulted in the intention of the Constitutional Convention of 1879 that article XIII, section 9, be used to enforce full cash value assessments. The history and development of pertinent constitutional and statutory tax provisions do not bear this out.

In 1872 Political Code section 3627 was adopted requiring that all property be assessed at ''full cash value''; section 3617 defined ''full cash value''; and there was incorporated in section 3692, subdivision 6, a prior statute (1870) creating a state board to equalize county rolls. The next year (1873) the Supreme Court upheld the constitutionality of section 3692, subdivision 6, and the statutory creation of the state board. (*Savings & Loan Society* v. *Austin* (1873) 46 Cal. 415.) Therein it discussed at length the reason for the establishment of the board—to eliminate the gross inequalities and lack of uniformity in the valuations of property in different counties of the state resulting in discriminatory underassessment; and after stating the purpose of the state board to

be—to equalize the assessment of taxes in the several counties to achieve equality and uniformity, the court said at page 474: "It was to remedy this great evil, [inequality and lack of uniformity] that the State Board of Equalization was established; and on which is devolved the duty of supervising the assessments in the several counties, so as to approximate as nearly as possible to equality and uniformity in the imposition of the burden of taxation upon the property of the citizen in proportion to its value. The dominant idea of the Constitution on the subject of taxation is, first, that it shall be equal and uniform throughout the State; ' [sic] and second, that "all property in the State shall be taxed in proportion to its value, to be ascertained *as directed by law*." This opinion did not mention fractional assessment either as a practice not lending itself to the realization of uniformity and equality of treatment and tax burden under the Constitution, or as an "evil" to be remedied. Section 3693, Political Code, also adopted in 1872, gave the state board the power to raise or lower the valuation of property by classes; but in 1874 the Supreme Court held it to be unconstitutional as constituting the state board as an assessing agency. (*Houghton* v. *Austin*, 47 Cal. 646.)

Thus, at the time of the Constitutional Convention of 1879, the statutory board had been deprived of its power to correct inequality and lack of uniformity among the counties. The large land owners of uncultivated land held by them for speculation were favored by local assessors and their estates were assessed at much lower rates for taxation than the small landholders. The debates and proceedings show that the framers of the Constitution were concerned primarily with eliminating this evil and were seeking a method of compelling equal and uniform assessments. The method they chose was the creation of a State Board of Equalization under article XIII, section 9. However, controversy arose over the power to be given the state board. Some contended that the only way in which equality and uniformity of property tax burdens could be realized was to give the state board the power to raise or lower individual assessments; others argued that such broad powers should not be given a state agency. (Shortly after the adoption of article XIII, section 9, the Supreme Court held that thereunder the state board is authorized to increase or lower the assessment roll of any county, but not the individual assessments thereon. (*Wells Fargo & Co.* v. *State Board of Equalization* (1880) 56 Cal. 194.)) While fractional assess-

ment was discussed during the Constitutional Convention the practice appeared to present no problem to its members, and no issue was made of it. (See Biennial Report of State Board of Equalization, 1878, 1879, pp. 4-5.) Their complaint was directed to discriminatory under-assessment of certain lands. When under-assessment exists, market value is obviously not being used as a standard. Under-assessment caused by discriminatory practices is far different from fractional assessment, for the latter cannot be discriminatory if the common standard of market value is used and a uniform ratio is applied to that standard. If the practice of fractional assessment had been an issue, as suggested by appellant, the result of the deliberations of the framers would have been reflected in the Constitution of 1870; but the latter is silent concerning any duty of the state or county boards to raise or lower assessment and assessment rolls to 100 per cent of full cash value, and it certainly contained no prohibition of fractional assessment. Neither the duty nor the power to equalize was set forth in terms of 100 per cent of market value in article XIII, section 9. Out of the same convention came section 1, article XIII, requiring that property be taxed in proportion to its value. (The same requirement had been contained in Const. 1849, article XI, section 13.)

In her opening and closing briefs appellant has set up certain language extracted from various cases in other jurisdictions upon which she heavily relies. These cases are not here persuasive in the face of controlling administrative, legislative and judicial acknowledgment and acceptance of the assessment and equalization process in California. Moreover an analysis of the cases cited by appellant reveals that no other state has a history and development of constitutional and statutory tax provisions comparable to California (see *Pierce* v. *Greene* (1940) 229 Iowa 22 [294 N.W. 237, 131 A.L.R. 335], wherein the history of taxation in that state was based on legislative not constitutional provisions); that in none is found the clear-cut administrative, legislative and judicial recognition of the practice of applying a uniform ratio to market value existing in this state (see *Schumacher* v. *State* (1962) 78 Nev. 167 [370 P.2d 209]); and that, while common to all jurisdictions is the goal of equality and uniformity of treatment and burden in property taxation, the means of achieving it substantially differs in the several states. It is true that assessments and equalization thereof based upon a standard of fair market value were discussed but in

none of the cases do we find a rejection of the concept approved in this state. The cases involve a variety of issues not here pertinent—a statutory standard (*State* ex rel. *Showalter* v. *Cook,* 175 Wash. 364 [27 P.2d 1075]), a statutory ceiling on tax rates (*People* ex rel. *State Board of Equalization* v. *Pitcher,* 56 Colo. 343 [138 P. 509]), the power to raise the assessment valuation of counties (*In re McNeal's Appeal* (1912) 35 Okla. 17 [128 P. 285]; *State* v. *Thomas* (1893) 16 Utah 86 [50 P. 615]), the appellate power of the state board (*State* ex rel. *Schoonover* v. *Stewart,* 89 Mont. 257 [297 P. 476], and fair valuation. (*J. Ray McDermott & Co.* v. *Hudson* (Wyo.) 370 P.2d 364.) (The Supreme Court of Wyoming, 1962.)

For the foregoing reasons the judgment is affirmed.

Wood, P. J., concurred.

FOURT, J.—I dissent. See the dissent in *Michels* v. *Watson, ante,* p. 416 [40 Cal.Rptr. 471] Civil No. 27835.

Appellant's petition for a hearing by the Supreme Court was denied October 28, 1964. Mosk, J., did not participate therein. Peters, J., was of the opinion that the petition should be granted.