[Sac. No. 7803. In Bank. June 15, 1967.]

COUNTY OF SACRAMENTO et al., Petitioners, v. IRENE HICKMAN, as Assessor, etc., Respondent.

John B. Heinrich, County Counsel, and Felix S. Wahrhaftig for Petitioners.

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General, Edward P. Hollingshead and Philip W. Marking, Deputy Attorneys General, as Amici Curiae on behalf of Petitioners.

Desmond, Miller & Desmond, Bill W. West, Carol Miller, Wilkins & Mix and Brian D. Flynn for Respondent.

MOSK, J.—This is an original petition for writ of mandate filed by the County of Sacramento, its board of supervisors,

and several school districts, to compel respondent county assessor to comply with Revenue and Taxation Code section 401, which requires the assessment of all taxable property at an announced fraction of its full cash value. The sole question presented is whether that statute is in conflict with the Constitution. We have concluded that the measure is valid, and hence that a peremptory writ should issue.

As part of an extensive property tax reform in 1966 (Stats. 1966, First Ex. Sess., ch. 147, § 34), Revenue and Taxation Code section 401 was rewritten to provide that ''Every assessor shall assess all property subject to general property taxation from the lien date for the 1967-68 fiscal year through the 1970-71 fiscal year at a publicly announced ratio of his own choosing which shall be between 20 percent and 25 percent of full cash value. [See fn. .1] Beginning with the lien date for the 1971-72 fiscal year, he shall assess all property subject to general property taxation at 25 percent of its full cash value.''[1] In implementation of this statute (see Gov. Code, § 15606) the State Board of Equalization promulgated a regulation requiring each county assessor to announce his chosen assessment ratio on or before the third Monday in January each year. (Cal.Admin.Code, tit. 18, § 251.)

On Monday, January 16, 1967, respondent announced that taxable property in Sacramento County would be assessed at 100 percent of full cash value for the 1967-68 fiscal year.[2] Petitioners thereafter filed this application for a writ of mandate to compel respondent to comply with section 401 and ''reduce the assessed valuations on the local roll to a uniform ratio of full cash value at a percentage between 20 percent and 25 percent, inclusive. . . .'' We issued an alternative writ.

In her return, respondent first demurred to the petition on the grounds that section 401 is unconstitutional and that the

[1]Section 401 was again amended in 1967 by Assembly Bill 12 (Stats. 1967, ch. 43, eff. April 17, 1967), which added a second paragraph prohibiting an assessor from announcing a ratio ''farther away'' from 25 percent than that of the preceding year. In respondent's supplemental points and authorities she attacks Assembly Bill 12 as special legislation directed against her alone in violation of article IV, section 16, of the California Constitution. The contention is untenable, for as the accompanying legislative declaration of urgency makes clear, Assembly Bill 12 is capable of general application and serves a public purpose.

[2]From the minutes of a meeting of the State Board of Equalization, appended as an exhibit to the petition, it appears that as of January 26, 1967, 43 county assessors had announced ratios of 25 percent of full cash value, nine had announced ratios between 20 percent and 25 percent, five had not yet reported, and only respondent had announced a 100 percent figure.

petitioning school districts are not beneficially interested parties. She then answered by various admissions and denials, and as an affirmative defense again alleged the unconstitutionality of section 401.

■■■ As a preliminary matter, we note that the absence of an adequate remedy in the ordinary course of law was determined by the granting of the alternative writ. (*Corona etc. Hospital Dist.* v. *Superior Court* (1964) 61 Cal.2d 846, 850 [40 Cal.Rptr. 745, 395 P.2d 817].) And in making the writ returnable before this court, we also necessarily determined that the case is a proper one for the exercise of our original jurisdiction. (See Cal. Rules of Court, rule 56(a).) Indeed, the issues presented are of great public importance and must be resolved promptly. The assessment of all taxable property in Sacramento County is currently being undertaken, and the local assessment roll must be completed on or before July 1 (Rev. & Tax. Code, § 616); unsecured property taxes became due on March 6 (Rev. & Tax. Code, § 2901) and, if unpaid, will become delinquent and subject to penalty on August 31 (Rev. & Tax. Code, § 2922). Petitioners list a number of administrative tasks relative to the equalizing, levying, collecting, and protesting of property taxes which must also be performed in the forthcoming months, and sufficiently show that the delay attendant upon first submitting this matter to a lower court would result in confusion in the administration of the tax laws and hardship and expense to the general public.

■■■ The writ of mandate lies to compel the performance of a clear, present, and ministerial duty "which the law specially enjoins." (Code Civ. Proc., § 1085.) It is settled that taxing authorities may be compelled by this writ to levy taxes or make assessments to provide funds required by law. (See, e.g., *May* v. *Board of Directors* (1949) 34 Cal.2d 125, 128-129 [208 P.2d 661]; *McAlpine* v. *Baumgartner* (1937) 10 Cal.2d 409, 413-414 [74 P.2d 753].) ■■■ There can be no doubt that respondent's duty to assess in accordance with law, for violation of which she may be civilly or criminally liable (Rev. & Tax. Code, §§ 1361-1366), is equally mandatory. Article XIII, section 1, of the Constitution declares in relevant part that "All property in the State . . . shall be taxed in proportion to its value, *to be ascertained as provided by law*" (italics added). This value, of course, is ascertained by assessment, and the duty to do so is laid upon the county assessor. Revenue and Taxation Code section 405 provides that "Annu-

ally, the assessor *shall* assess all the taxable property in his county, except state-assessed property, to the persons owning, claiming, possessing, or controlling it on the lien date." (Italics added.) The duty must be performed in compliance with the several statutes prescribing the method by which property is to be assessed. (E.g., Rev. & Tax. Code, div. 1, pt. 2, ch. 3.) Among those statutes is Revenue and Taxation Code section 401, quoted above, which commands that until the 1971-72 fiscal year "Every assessor *shall* assess" the taxable property in the county at a publicly announced ratio of his own choosing "which *shall* be between 20 percent and 25 percent of full cash value" (italics added.) ▆ "Full cash value" is elsewhere defined to mean "the amount at which property would be taken in payment of a just debt from a solvent debtor" (Rev. & Tax. Code, § 110); this value, we have explained, "might be called the market value of property for use in its present condition" (*De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 562 [290 P.2d 544]).

▆ Under the foregoing principles, petitioners have made out a prima facie case for a peremptory writ of mandate to compel respondent to comply with section 401.[3] Respondent's sole defense, accordingly, is the asserted unconstitutionality of that statute.

Respondent's position is premised upon a literal reading of article XI, section 12, of the Constitution, which declares in relevant portion that "All property subject to taxation shall be assessed at its full cash value." That language was added in 1933, as part of a substantial revision of our constitutional and statutory tax laws. (Sen. Const. Amend. 30, Stats. 1933, pp. 3072-3078.) It was, however, virtually identical to former Political Code section 3627, enacted in 1872, which provided that "All property must be assessed at its full cash value."[4]

Respondent contends that article XI, section 12, is clear and unambiguous, and hence is not subject to interpretation;

[3] We need not reach respondent's contention that the petitioning school districts are not beneficially interested parties, for respondent does not deny that the county and its board of supervisors have sufficient interest in the matter to be entitled to issuance of the writ.

[4] In 1939 the provisions of Political Code section 3627 were transferred to section 401 of the new Revenue and Taxation Code, which similarly declared that "Except as provided in this part, all taxable property shall be assessed at its full cash value." As noted at the outset, section 401 was rewritten in 1966 by deleting the reference to "full cash value" and substituting the assessment ratio provisions here in issue.

rather, the courts must give effect to the plain meaning of its words. Respondent further contends that article XI, section 12, is mandatory and binding on all departments of the state government, and that no assessor has discretion to disobey its command. Conceding that at the time of its adoption in 1933 there was a long-standing administrative practice of assessment at a fraction of full cash value, sanctioned by the State Board of Equalization, respondent contends that the practice was illegal and may not be used as an interpretative aid because the constitutional provision is not ambiguous. Acknowledging also that the Legislature has long been aware of the practice, respondent contends that the continuing enactment of statutes using the phrase ''full cash value'' does not constitute legislative acquiescence in this meaning. Conceding, finally, that by 1933 this court and the Courts of Appeal had given repeated judicial recognition to this practice without any intimation of disapproval, respondent contends that such expressions may be disregarded as dicta because the decisions involved problems of equalization rather than the legality of the method of assessment.

These contentions are not new to us. The points they raise, and others that could be urged, have all been adjudicated adversely to respondent's present position in the cases of *Michels* v. *Watson* (1964) 229 Cal.App.2d 404 [40 Cal.Rptr. 464], and *Hanks* v. *State Board of Equalization* (1964) 229 Cal.App.2d 427 [40 Cal.Rptr. 478]. In *Michels,* a taxpayer sought to compel a county assessor to assess at full cash value rather than the 25 percent ratio he had announced; after an exhaustive review of the administrative, legislative, and judicial history of assessment in California, it was held that article XI, section 12, does not prohibit assessment at a uniform fraction of full cash value. In *Hanks,* a taxpayer sought to compel the State Board of Equalization to increase the assessment rolls of all counties to full cash value; upon a detailed examination of the constitutional powers and duties of the board, it was held that article XIII, section 9, permits that agency to equalize on the basis of uniform fractions of full cash value.

The taxpayers thereupon petitioned this court for further review, but we denied a hearing in each case. In the proceeding at bar we have again considered these arguments on their merits, and conclude that they were properly resolved in *Michels* and *Hanks.* As the latter are published opinions and

are readily available, they need not be reproduced in detail here. However, we allude briefly to their general rationale.

The 1933 amendment of article XI, section 12, must be viewed in its historical context. As noted above, section 3627 of the Political Code, enacted in 1872, declared that all property must be assessed "at its full cash value." In so providing, the Political Code merely reiterated the language of earlier California fiscal laws. As the State Board of Equalization observed in its first report after enactment of the code, "Every revenue bill, without exception, had required property to be assessed at its full cash value. The Code, therefore, did not introduce a novelty in the rule of evaluation. . . ." The board further pointed out, however, that "The most casual acquaintance with the practice of assessing property" prior to 1872 "shows a very wide departure from" assessment at full cash value, "apparently by the common consent of the Assessors and the taxpayers. . . ." (Report of State Board of Equalization for 1872-1873, p. 4, in Appendix to Journals of Senate and Assembly (20th Sess. 1874) vol. 2.)

This practice continued throughout the ensuing 60 years, and the assessing authorities consistently construed the language of section 3627 to permit assessment at a uniform fraction of full cash value provided the latter remained the standard or basis of each assessment: i.e., the market or "fair cash" value of the property was first determined by appropriate valuation techniques, and the resulting figure was reduced by applying thereto the "assessment ratio," expressed as a percentage, of "assessed value" to market value in the county as a whole. The practice was widely known, and was regularly communicated to the executive and legislative branches through the reports and studies of the State Board of Equalization.[5] During the same period numerous decisions of our courts gave judicial recognition to the practice, describing its operation without disapproval. (E.g., *Birch* v. *County of Orange* (1921) 186 Cal. 736, 740-741 [200 P. 647]; *Southern Pacific Land Co.* v. *County of San Diego* (1920) 183 Cal. 543, 545 [191 P. 931]; *Hammond Lumber Co.* v. *County of Los Angeles* (1930) 104 Cal.App. 235, 244 [285 P. 896]; *Birch* v. *County of Orange* (1927) 88 Cal.App. 82, 87 [262 P.

[5]In its 1921-1922 report to the Legislature, for example, the State Board of Equalization observed that "Property taxed in California on an ad valorem basis is not assessed at its full market value; in fact, is assessed on an average at a little less than 50% of its market value." (Report of State Board of Equalization for 1921-1922, p. 71, in Appendix to Journals of Senate and Assembly (45th Sess. 1923) vol. 2.)

788]; *Wild Goose Country Club* v. *County of Butte* (1922) 60 Cal.App. 339, 343 [212 P. 711].) Although these cases primarily presented questions of equalization, it cannot be assumed that our courts were ignorant of the command of Political Code section 3627 or that they would have countenanced an open and consistent violation of its terms.

In its 1931-1932 report, the State Board of Equalization again noted that property throughout the state was not being assessed at full cash value, but rather at an average ratio of 43.22 percent of that value; yet in its several proposals for constitutional and statutory solutions to the grave depression period fiscal crisis then facing the state, the board made no recommendation whatever of abandoning the practice of fractional assessing. Contemporary legislative recognition of the practice appears, for example, in the 1929 amendments to the Drainage District Act of 1903 (Stats. 1903, ch. 238, p. 291), cited by respondent. As originally enacted, section 41 of that act provided that if a special drainage district extended to more than one county, its board of directors must apportion the tax burden according to the assessed value of the district's property in each county; in 1929, however, the Legislature took cognizance of the practice herein described by amending section 41 to require such apportionment to be adjusted if the board finds that the assessment of the property in the several counties ''is on a different basis as compared with the actual value thereof'' (Stats. 1929, ch. 735, p. 1381). Finally, an example of contemporary judicial acquiescence may be found in *L. W. Blinn Lumber Co.* v. *County of Los Angeles* (1932) 216 Cal. 474, 477 [14 P.2d 512, 84 A.L.R. 1304], in which the court noted without comment that the assessor had fixed the assessed value of a leasehold at 50 percent of his computation of its full cash value.

Thus matters stood on the eve of the 1933 amendment to article XI, section 12. ■ [See fn. 6] We find no fault with the canons of construction invoked by respondent, but they are inapplicable to the historical facts before us.[6] ■ Here the controlling consideration is that when the rele-

---

[6]We disagree, however, with respondent's sweeping assertion that in all cases ''ambiguity is a condition precedent to interpretation.'' Although this proposition is generally true, ''The literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole.'' (*Silver* v. *Brown* (1966) 63 Cal.2d 841, 845 [48 Cal.Rptr. 609, 409 P.2d 689], and cases cited.)

vant portion of article XI, section 12, of the Constitution was added in 1933, it was in language virtually identical to Political Code section 3627 and its predecessors. In this circumstance the applicable canon is that "In the absence of contrary indication in a constitutional amendment, terms used therein must be construed in the light of their statutory meaning or interpretation in effect at the time of its adoption." (*Michels* v. *Watson* (1964) *supra*, 229 Cal.App.2d 404, 408.) This is a well settled rule with respect to provisions of our Constitution copied from prior constitutions of this or another state: "When the framers of the constitution employ terms which have received judicial interpretation, and have been put into practice under a former constitution, so as to receive a definite meaning and application, it is safe to give them the signification which has been sanctioned by such interpretation, unless it is apparent from the language used that a more general or restricted sense was intended. In determining the meaning of a constitutional provision, it will be presumed that those who framed and adopted it were conversant with the interpretation which had been put upon it under the constitution from which it was copied; . . ." (*Lord* v. *Dunster* (1889) 79 Cal. 477, 485 [21 P. 865]; accord, *In re Lavine* (1935) 2 Cal.2d 324, 331 [41 P.2d 161, 42 P.2d 311]; *People* v. *District Court of Appeal* (1924) 193 Cal. 19, 20 [222 P. 353]; *People* v. *Vereneseneckockockhoff* (1900) 129 Cal. 497, 500 [58 P. 156, 62 P. 111]; *In re Newman* (1960) 187 Cal.App.2d 377, 382 [9 Cal.Rptr. 746]; *People* v. *Mims* (1955) 136 Cal.App.2d 828, 831-832 [289 P.2d 539], and cases cited.) The reason for the rule, of course, is that "we cannot suppose that the framers of the new constitution were ignorant of the point decided, or that they intended the provision we adopted from the old constitution to have an operation theretofore uniformly denied to it" (*Ex parte Ahern* (1894) 103 Cal. 412, 414 [37 P. 390]); and the new constitutional provision should be given the construction placed upon its predecessor even though we might not have so decided the point as a matter of first impression (see *People* v. *O'Brien* (1892) 96 Cal. 171, 181-182 [31 P. 45]).

The same canon applies when, as here, the Constitution is amended by incorporating into it a statute rather than a prior constitutional provision: "If words are used which are employed in a certain sense in the constitutions or *statutes* of other States (adopted or enacted prior to our own), it is proper to consider them as employed in the same sense in our

Constitution, unless the context indicates that they were intended to convey a different idea." (*People* v. *Lynch* (1875) 51 Cal. 15, 28 [21 Am.Rep. 677].) ▇▇ When for more than 60 years a statute has been construed in a consistent manner by the administrative agencies charged with its enforcement, and the practice has been consistently acquiesced in by the Legislature and recognized by the courts, its language comes to the Constitution clothed in that special meaning. It is too late to return, as respondent urges, to the literal sense of the words used; to strip them of their acquired connotation at this late date would be arbitrarily to deny the experience of all the preceding years.

We conclude, as did the court in *Michels* and *Hanks*, that the 1933 amendment to article XI, section 12 must be deemed to have incorporated into the Constitution the settled interpretation of its predecessor statute, Political Code section 3627, and hence to have authorized assessment at a uniform fraction of full cash value provided the latter remained the standard or basis of each assessment.

This reading of the events of 1933 is supported by administrative, legislative, and judicial pronouncements immediately after the amendment. The 1933-1934 report of the Board of Equalization discussed the recent changes in the California tax system, including property tax relief, but made no reference to any change in the method of assessing.[7] Even more significantly, the report noted that beginning in 1935 the property of the public utilities would be returned to the local tax rolls but would be assessed by the board, and emphasized the continuing need "for a thorough analysis of local assessment ratios in order that there may be no disparity between the assessments made by the State Board of Equalization and those made by local assessors upon property which will appear on the same assessment rolls and be subjected to like tax rates. To meet this need, a Valuation Division, created by the board in November, 1933, in pursuance of statutory authorization has continued the work of analyzing local assessment ratios and has gathered data showing the average burden of local taxation as of the first Monday in March of 1934." (Report

[7]It is noteworthy that the report was prepared and signed by Ray L. Riley, the State Controller, and the members of the State Board of Equalization, one of who was Fred E. Stewart. These two individuals had also been the chief architects and proponents of Senate Constitutional Amendment 30, which included the amendment of article XI, section 12. Indeed, the entire proposal had commonly been known as the "Riley-Stewart Plan."

of State Board of Equalization for 1933-1934, p. 28.) On the latter topic, the report recited without comment that "As in previous years, investigation has disclosed that property tax on an ad valorem basis in California is not assessed ordinarily at its full market value. Comparison of the assessed and appraised values of such property leads to the conclusion that property, on the average, is assessed at 46.66 percent of its true value." (*Id.* at p. 29.) Finally, respondent herself asserts that the Valuation Division of the board proceeded to fix the "assessment ratio" of public utility property at 50 percent of full cash value.

Legislative recognition of the lack of change brought about by the 1933 amendment is illustrated by the enactment of former Political Code section 3663b (now see Rev. & Tax. Code, §§ 1901-1908) at the 1935 regular session, the first held after the constitutional revision. The new section 3663b gave the State Board of Equalization the power to equalize its assessments of public utility property within a city with those of other property in the city as determined by the city assessor; in its declaration of urgency requiring the statute to take immediate effect, the Legislature stated that such equalization was necessary because "In many cities in the State of California, the ratio between the assessed value as determined for the purposes of municipal taxation and the true value of the taxable property differs materially from the corresponding ratio of the assessed value as determined by the county assessor." (Stats. 1935, ch. 259, p. 944.)

Again, contemporary judicial acknowledgment of the lawfulness of uniform fractional assessing appears in *Rittersbacher* v. *Board of Supervisors* (1934) 220 Cal. 535 [32 P.2d 135]. In holding that the plaintiff property owners therein had not made a sufficient showing of the constructive fraud necessary to invalidate their assessments, this court observed (at pp. 543-544) that "In arriving at the value of all property for the purposes of assessment the assessor is guided generally by section 3617 of the Political Code which defines the term 'value' as 'the amount at which the property would be taken in payment of a just debt from a solvent debtor.' This value is expressed in section 3627 of the Political Code as the 'full cash value' for purposes of assessment. It is the assessor's recognized duty to see that the valuation placed on the various kinds of property shall be in proportion to the worth of such properties. If it is proportional and all are treated alike, no one contends that the taxpayers must be

charged a full hundred per cent, *for such is not required by the law.*" (Italics added.)[8]

Although the facts of *Rittersbacher* arose just prior to the 1933 amendment of article XI, section 12, the decision was filed in the following year and the opinion made no reference to any intervening change in the law. A case dealing with subsequent facts is *Southern Cal. Tel. Co.* v. *County of Los Angeles* (1941) 45 Cal.App.2d 111 [113 P.2d 773], which sustained an assessment of public utility property by the State Board of Equalization for 1935, the first year in which such assessments were made under the 1933 constitutional amendments. Although article XIII, section 14, also adopted in 1933, declared that utility property "shall" be assessed "at the actual value of such property," the board made its assessment on the basis of a fractional assessment ratio, and the court held the taxpayer had not proved that "the percentage of value applied by the board grossly exceeds the percentage of value for which common property throughout the state is assessed for purposes of general taxation," the latter figure being 46.66 percent. This court denied a hearing.

From the foregoing it is obvious that neither the assessing authorities, nor the Legislature, nor the courts believed that the addition of the "full cash value" provision to the Constitution in 1933 had been intended to effect any change in the lawfulness of the assessment practice under the prior statutory law. Indeed, it seems clear that "full cash value" are accepted words of art in the field of taxation.

Respondent's efforts to distinguish *Michels* are ineffectual, and need not be analyzed in detail.[9] ■ Respondent then falls

---

[8]There is no merit in respondent's argument that the word "it" in the last sentence quoted means "tax," a concept not even under discussion in that paragraph; according to basic rules of syntax and common sense, the word must refer to assessed valuation. By the same token, the word "charged" in this context must mean "assessed," for the court would scarcely take the trouble to state that property need not be "taxed a full hundred percent."

[9]Numerous decisions of this court subsequent to *Rittersbacher* which recognize the practice are collected in *Michels* at pages 413-414 of 229 Cal.App.2d; since *Michels*, we have again recognized the practice on two recent occasions (*El Tejon Cattle Co.* v. *County of San Diego* (1966) 64 Cal.2d 428, 429 [50 Cal.Rptr. 546, 413 P.2d 146]; *County of Riverside* v. *Palm-Ramon Development Co.* (1965) 63 Cal.2d 534, 537, fn. 3 [47 Cal. Rptr. 377, 407 P.2d 289]; see also *County of Amador* v. *State Board of Equalization* (1966) 240 Cal.App.2d 205, 217 [49 Cal.Rptr. 448]; *O'Mara* v. *Council of the City of Newark* (1965) 238 Cal.App.2d 836, 839 [48 Cal.Rptr. 208]).

back to the position that, at most, fractional assessing is "permissive" under *Michels'* view of article XI, section 12, and that the Legislature may not make it mandatory. There is no authority for this proposition, and it is manifestly untenable. Since article XI, section 12, allows assessment at a uniform fraction of full cash value provided the latter remains the standard or basis of each assessment, the Legislature has the constitutional power to prescribe that fraction for statewide application, thereby promoting the equality, uniformity, and lack of secrecy which are the goals of a fair tax system.

Petitioners and amicus curiae, the State Board of Equalization, contend that Revenue and Taxation Code section 401, together with other provisions of the 1966 tax reform, will cure various evils and abuses that are said to have plagued property taxation in this state since its inception. ▋ Respondent denies this will be the result, contending that inequality could still exist between individual taxpayers, that assessors could still secretly underappraise, and that any appraisal errors will be magnified by fractional assessing. Such contentions are pragmatic, however, relating to the wisdom and workability of the statute rather than to its constitutionality; accordingly, they are beyond the scope of our review. (*Wilke & Holzheiser, Inc.* v. *Department of Alcoholic Beverage Control* (1966) 65 Cal.2d 349, 359 [55 Cal. Rptr. 23, 420 P.2d 735], and cases cited.)

▋▋ Finally, there is no merit in respondent's contentions that section 401 is void under article XI, section 12, on the ground that the assessor is not one of the corporate authorities of the county empowered "to assess and collect taxes" (see Gov. Code, § 24000, subd. (j) ; Rev. & Tax. Code, §§ 405, 501, 601, 617), or that section 401 denies equal protection of the laws to hypothetical veterans in different counties (cf. *In re Cregler* (1961) 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305]).

The demurrer is overruled. Let a peremptory writ issue as prayed. This order is final forthwith.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.