[Civ. No. 26128. First Dist., Div. Four. Aug. 1, 1969.]

TALCOTT BATES et al., Plaintiffs and Appellants, v. STATE BOARD OF EQUALIZATION et al., Defendants and Respondents; FRED COULMAN et al., Interveners and Appellants.

Kenneth A. Ehrman and Sean Flavin for Plaintiffs and Appellants.

William A. White for Interveners and Appellants.

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General, Philip W. Marking and John J. Klee, Jr., Deputy Attorneys General, for Defendants and Respondents.

DEVINE, P. J.—This case involves the interpretation and application of article XIII, section 1¼ of the Constitution of California. The section provides an exemption from taxation of property to the amount of $1,000 for veterans, their widows and their widowed mothers; but contains a provision that the exemption shall not apply to any person owning property of the value of $5,000 or more, or whose wife owns property of the value of $5,000 or more.

## Appeal of Original Plaintiffs

The original plaintiffs, appellants Talcott Bates, a veteran, and A. Tregoning Cape, a nonveteran, both taxpayers, brought this action on behalf of themselves and all others similarly situated who do not qualify for the veterans' exemption, seeking writ of mandate to compel Donald P. Stewart as Assessor of Monterey County to revise his method of valuing property and to compel the State Board of Equalization to revise its instructions to all assessors. Presently, assessors use the assessed value of taxable property as establishing the ceiling; they use full cash value for nontaxable property. The assessors take the assessed value of property outside of California if it is taxable, and the full cash value if it is not taxable. The $5,000 limitation is doubled for a married couple, under the constitutional section. Encumbrances on taxable property are not deducted. Thus, if a veteran and his wife jointly own a home in a county where the assessment ratio is 25 percent, the home may have a value up to $39,999 and the veteran will still be entitled to the $1,000 exemption. Appellants seek to have the full cash value taken as the ceiling. Obviously, in the example just given, the veteran would have no exemption. A ceiling of $5,000 for single veterans and $10,000 for the married, if full cash value were taken, would virtually eliminate the veterans' exemption in California, at least so far as homeowning is concerned. There must be very few veterans who, with their spouses, own a home the gross market value of which is less than $10,000.

The veterans' exemption was created by constitutional amendment in 1911. In 1912, when the assessors wished to know whether the word "value" as applied to the "ceiling" meant assessed or market value, one of them put inquiry to the Attorney General. The Attorney General replied that because all property must be taxed at its full cash value under section 3627 of the Political Code (as it then existed), it would be presumed that assessors would conform their practice with the statute and that an assessor "would stultify himself" if he claimed that the assessed value was anything but the full cash value for the purpose of exemption. Actually, assessors had not assessed property at its full cash value since 1871. In following the Attorney General's opinion, therefore, the assessors were applying a theory of the law which was not being borne out in fact; but in doing so they did no differently than was their practice in respect of assessments generally.

The plain fact of the matter is that for nearly one hundred years fractional assessments were made by assessors in contravention of the literal wording of the statute. From 1912, the first year in which they were called upon to apply the veterans' exemption, the assessors continuously applied the assessed value to what we have called for convenience in this opinion the "ceiling." No one has challenged the practice in a lawsuit prior to the present one. The Attorney General ratified the original opinion by a second one in 1930. ■ Continuous administrative interpretation of a constitutional provision is a persuasive force in its construction, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized. (*Coca-Cola Co.* v. *State Board of Equalization,* 25 Cal.2d 918, 921 [156 P.2d 1]; *Michels* v. *Watson,* 229 Cal.App.2d 404, 409 [40 Cal.Rptr. 464].) We are mindful, however, that the final responsibility for the interpretation of the law rests with the courts. (*Whitcomb Hotel, Inc.* v. *California Employment Com.,* 24 Cal.2d 753, 757 [151 P.2d 233, 155 A.L.R. 405]; *California Employment etc. Com.* v. *Payne,* 31 Cal.2d 210, 213 [187 P.2d 702].) ■ We proceed, therefore, to examine the interpretation given by the Board of Equalization, by the assessors, and by the Attorney General, regarding their interpretation favorably although not as conclusively correct.

We observe, in the first place, that the crucial word in the constitutional section is "value." It is not "full cash value," the expression which appears in article XI, section 12 of the Constitution, wherein it is said, "All property subject to taxation shall be assessed for taxation at its full cash value." Now, in *County of Sacramento* v. *Hickman,* 66 Cal.2d 841 [59 Cal.Rptr. 609, 428 P.2d 593], the Supreme Court held that even the words "full cash value" are accepted words of art in the field of taxation (p. 853). By reference to historical development of constitutional sections, of statutes, and of judicial decisions, the Supreme Court held that fractional assessments so long established in practice were not only permitted but had become mandatory, so that an assessor might not value property at its market value. Although the word "value" may generally be synonymous with "full cash value" (p. 846), nevertheless the omission of the words "full cash" from article XIII, section 1¼ seems to give at least as much flexibility in the matter of interpretation as does the term "full cash value." We shall proceed to examine, as the

court did in the *Hickman* case, the history of article XIII, section 1¼.

We commence by considering actions taken upon the Constitution itself, all of which, of course, required decision by the voters. In the years since 1912, there have been amendments to article XIII, section 1¼ in 1922, 1926, 1932, 1944, 1954, 1960 and 1964.[1] Each of these left unchanged the $5,000 limitation. In 1964 the voters increased the limitation for veterans' widows from $5,000 to $10,000. The ballot argument opposing the amendment had stated, in part: "Moreover, remember that when Proposition No. 5 would allow the exemption for a widow owning less than $10,000 worth of property, it is speaking of assessed valuation where real property is involved. Real property assessed at just under $10,000 may have an actual market value up to $40,000."

In 1948 an amendment to article XIII, section 1¼ was proposed by the Legislature, which would provide that the $5,000 property ownership limitation be determined according to the assessed value of the property. This was defeated by the voters. It is argued that therefore the voters rejected the assessors' practice, which was then of some 36 years' duration. A reading of the arguments for and against the proposed amendment shows that this is unlikely. The argument in favor said that "a few remote assessors" had been applying values in excess of the assessed valuations and that the amendment was designed to make conditions uniform. The argument against the amendment was not that the practice of using the assessed valuation of taxable property was wrong, but that adoption would mean that any veteran could gain an exemption even though he owned thousands of dollars of stocks and bonds, first mortgages, or property in other states which are not "assessed." Following defeat of the amendment, no one apparently suggested that a change should be effected in the assessors' practice and it has continued to this day, the present lawsuit being the single legal action taken against it.

---

[1] *Amendment of 1922:* includes veterans released from active duty under honorable conditions. *Amendment of 1926:* includes veterans discharged because of disability resulting from service in peacetime, and exempts property owned by Ladies of the Grand Army of the Republic and the California Widows Home Association. *Amendment of 1932:* includes veterans continuing in service after wartime service. *Amendment of 1944:* includes coast guard veterans and recipients of a military medal. *Amendment of 1954:* includes paraplegics. *Amendment of 1960:* transfers provision for totally disabled veterans to new section 1¼a and adds clause for subsequently acquired homes. *Amendment of 1964:* increases the exemption limitation for veterans' widows, and establishes residency requirement.

But the voters have been discriminating in their decisions. Although several amendments were carried, as stated above, three besides the one in 1948, just mentioned, were defeated.[2]

The Legislature has been apprised, of course, of the practice of fractional assessments. Not only has the practice been common knowledge throughout the state, but it has also been regularly communicated to the Legislature as well as to the executive branch. (*County of Sacramento* v. *Hickman, supra,* 66 Cal.2d at p. 848.) Specifically, in respect of the $5,000 limitation, the Subcommittee on Veterans' Tax Exemption of the Senate Interim Committee on the Study of Districts made a report to the 1958 Legislature. The subcommittee made several proposals. In the report there were several suggestions of possible solutions of problems connected with veterans' exemptions, which were put before the Legislature not as a conclusion of the committee or of the subcommittee, but as basis for discussion and review. Not one of these suggestions, of which there were 14, was that the practice of the assessors in using assessed valuations for the ceiling should be eliminated.

In 1967 the Legislature did enact legislation tightening the administration of the exemption. (Stats. 1967, ch. 148, p. 1213 [amending §§ 501, 504, 1603 and 1604.1 of, and adding article 3 (commencing with § 280) to chapter 1 of part 2 of division 1, and adding §§ 506 and 531.5 to, the Rev. & Tax Code].) But this chapter does not purport to change the assessors' practice, as described above.

No doubt a large percentage of the veterans who presently claim the exemption, in buying homes for their families, have taken into calculation the exemption which, if appellants' position were sustained, would now be denied to them. We believe that, as the Supreme Court put it: "It is too late to return . . . to the literal sense of the words used; to strip them of their acquired connotation at this late date would be arbitrarily to deny the experience of all the preceding years." (*County of Sacramento* v. *Hickman, supra,* 66 Cal.2d at p. 851.)

We have taken note of appellants' examples of extraordinary cases, such as outsize exemptions allowed to the owner of fishing vessels, which are assessed at one percent of their

---

[2] *1938*: to apply exemption to motor vehicle "in lieu" tax and to exclude peacetime disabled veterans. *1948:* that the state reimburse cities and counties for tax losses due to exemption. *1950:* exemption of possessory interests.

market value (Rev. & Tax. Code, § 227), and of aircraft, which are assessed at 100 percent of market value (Rev. & Tax. Code, §§ 5362-5363), instead of the general assessed valuations which are between 20 and 25 percent, and by the 1971-1972 fiscal year will be uniformly 25 percent of full cash value (Rev. & Tax. Code, § 401). But these exceptional cases are the product of legislative decisions as to the assessments themselves. The effect upon the property limitations as related to the veterans' exemption is but an extension of the principal legislative acts.

The trial judge was correct in denying the writ of mandate to the original plaintiffs.

### Interveners' Appeal

The interveners are Fred Coulman, a nonveteran, and Edward Sharkey, a veteran. Their attack upon the practice of the assessors comes from an opposite position from that of the original plaintiffs. Interveners are owners of two kinds of property: some taxable, some nontaxable. (If they were owners of nontaxable property only, they would have no direct interest in the veterans' exemption. Since they would have nothing taxed, exemption would be meaningless.) Interveners contend that nontaxable property should not be counted at all in setting of the ceiling; but that if this position be not tenable, at least that the nontaxable property should be taken at a percentage equal to the ratio of assessed valuation to market valuation of taxable property. Thus, for example, if the assessment ratio in a given county were 25 percent, then the ceiling of nontaxable property should be 25 percent of the market value. Obviously, either of these contentions, if successfully made, would amplify greatly the total veterans' exemption throughout the state. If the first of the two were accepted, a veteran, in order to gain exemption, need only hold his taxable property within limits described in the first part of this opinion. He could own an unlimited amount of nontaxable property and it would not be applied toward the ceiling. If the second proposition were adopted, the result of course would not be so favorable to the veteran as would adoption of the first; nevertheless, to the extent that his property holdings were nontaxable, many veterans would gain a considerable advantage from the use of the equivalent of the assessed rather than the market valuation of their nontaxable holdings.

Interveners' argument in support of their first proposition is this: Article XIII, section 1¼ refers only to taxation and

therefore the property mentioned therein should mean only taxable property. To this argument, the reply is the same as that given to the original plaintiffs, that is, that long-established practice of the administrative agencies, together with the conduct of the Legislature and the veterans, gives true interpretation in this instance to the word ''property'' in reference to the $5,000 ceiling.

In particular, we make reference again to the proposed amendment, in 1948, which was rejected by the voters. Although the intent of the proposers of this amendment, as explained above, seems to have been simply to ratify the long-standing practice of the assessors in taking the assessed value rather than any other value of taxable property, the argument against it, as submitted to the voters, was that adoption would greatly increase the exemption of holders of nontaxable property. Plainly, it was the general understanding of the voters that nontaxable property should be included in arriving at the ceiling and taken at its market value.

What has been said above applies to interveners' second proposition as well. But at this point we must consider interveners' argument that there is no good reason presently for applying a different and higher valuation to nontaxable property than to taxable property. We say ''presently'' because since section 401 became effective in 1967, each assessor must announce publicly the assessment ratio. Thus, argue interveners, since the theory of ''full cash value'' has been abandoned and a definite ratio has been established, equality should be achieved by the process of using what would be the assessed valuation if the nontaxable property were actually assessed.

The 1958 report of the Senate Interim Committee to the Legislature, referred to above, discloses that the Legislature was made aware not only of the fact that nontaxable property was counted in computing the ceiling and that the Attorney General had advised that this was proper (Ops.Cal.Atty. Gen. No. 8059 (1932)), but also that diverse processes were used by the different assessors to determine the value of various properties. But we do not find in the actions of the Legislature, in making the widespread corrections which marked the year 1967, an intent to change the established practice of the Board of Equalization and of the assessors in respect of the veterans' exemption.

Nor do we find any denial of equal protection of the laws. A veterans' nontaxable property is 100 percent exempt from

396

taxation itself. The veteran who owns a home pays taxes on it and, to the extent that he is allowed an exemption, gains some measure of relief. The veteran whose holdings are mixed may in some instances be deprived of that relief because of his ownership of property on which he pays no taxes.

We do not mean to say that perfect uniformity is attained, but this is not required in taxing laws. (*Carmichael* v. *Southern Coal & Coke Co.*, 301 U.S. 495 [81 L.Ed. 1245, 57 S.Ct. 868, 109 A.L.R. 1327].) We uphold the trial court's decision against interveners.

The judgment is affirmed.

Rattigan, J., and Christian, J., concurred.

The petition of the interveners and appellants for a hearing by the Supreme Court was denied September 24, 1969.