[No. B036068. Second Dist., Div. Three. Sept. 18, 1989.]

CITY OF LOS ANGELES, Plaintiff and Respondent, v.
LOS OLIVOS MOBILE HOME PARK et al., Defendants and
Appellants.

**COUNSEL**

Fischer, Krane, Jacobson & Kabat, Krane, Spolin, Rosin & Kabat, Jules L. Kabat and Robert L. Weiss for Defendants in Intervention and Appellants.

James K. Hahn, City Attorney, Claudia McGee Henry, Sr., Assistant City Attorney, Jolaine Harkless and L. Wayne Mooney, Deputy City Attorneys, for Plaintiff in Intervention and Respondent.

**OPINION**

**KLEIN, P. J.**—Defendants in intervention and appellants Los Olivos Mobile Home Park, a partnership (the Park), Richard H. Dunn, Paula E. Sprague Dunn, James A. Dunn, Paula Long and Nina Seldner (sometimes collectively referred to as the Park), appeal a declaratory relief judgment in

favor of plaintiff in intervention and respondent City of Los Angeles (the City).

The issue presented is whether the Park is subject to rent control or whether it comes within an exemption for newly created rental units.

Because the subject tenancies come within the rent control ordinance's exemption for new rental units, the judgment is reversed.

FACTUAL & PROCEDURAL BACKGROUND

The Park, located in Sylmar, consists of 81 rental spaces. The Park's residents own their mobilehomes and lease the land beneath their homes from the Park. The first statement of installation acceptance, approving a mobilehome for occupancy, was issued to a mobilehome at the Park on February 1, 1980.

In 1984, plaintiffs William Ranalli and others, tenants of the Park, filed a declaratory relief action against the Park, seeking a judicial declaration that their tenancies are governed by the City's Rent Stabilization Ordinance (RSO).

On May 22, 1987, the City entered the litigation by filing a complaint in intervention against the Park. The City sought a declaration that the Park was subject to the RSO and did not qualify for any exemption because the RSO only exempts mobilehome parks where a permit to operate was first issued on or after February 10, 1986.

The Park maintained it comes within the RSO's exemption for newly created housing, which it defines as "Housing accommodations located in a structure for which a certificate of occupancy was first issued after October 1, 1978." (L. A. Mun. Code, § 151.02, subd. M(6), hereinafter subd. M(6).)[1]

The parties filed trial briefs supported by declarations and exhibits. The trial court severed the City's complaint in intervention from the underlying complaint. Following argument on the matter, the trial court entered judgment in favor of the City, holding: Under the plain language of the RSO, the Park is not a structure and therefore is not exempt new construction; this analysis is supported by the interpretation of the agency charged with administering the RSO; and, a contrary interpretation would render a 1984

---

[1] All subsequent section references are to the Los Angeles Municipal Code, unless otherwise specified.

amendment at least partially ineffective and would render a 1986 amendment surplusage.

The Park appealed.

## CONTENTIONS

The Park contends: (1) the City enacted the RSO in 1979, creating exemptions for the purpose of inducing the private sector to provide greatly needed new affordable housing; (2) mobilehomes receive "Certificates of Occupancy" and fit within the exemption for new construction; (3) the City's attempt to exclude mobilehomes receiving a "Statement of Installation Acceptance" as opposed to a "Certificate of Occupancy" is a denial of equal protection; (4) subdivision M(6) is ambiguous and clearly applies to mobile homes which receive a Certificate of Occupancy; (5) the City's assertion that weight should be given to the agency's interpretation further establishes the ambiguity in the exemption; and (6) there is no basis to attempt to separate the Park from the mobilehomes, and even if done, the Park itself is like a subdivision, fitting within the common meaning of "Structure."

## DISCUSSION

1. *Standard of appellate review.*

■ The purpose of declaratory relief is to liquidate uncertainties and controversies which might result in future litigation. ■ Whether a determination is proper in an action for declaratory relief is a matter within the trial court's discretion. (*Mefford* v. *City of Tulare* (1951) 102 Cal.App.2d 919, 922 [228 P.2d 847]; *Interstate Marina Development Co.* v. *County of Los Angeles* (1984) 155 Cal.App.3d 435, 443 [202 Cal.Rptr. 377].)

■ The interpretation of a statute, however, is a question of law on which we are not bound by the trial court's determination. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].)

2. *Applicable ordinances.*

a. *The 1978 moratorium.*

In the wake of Proposition 13, on August 30, 1978, the city council passed Los Angeles Ordinance No. 151,415, which temporarily rolled back

rents, and on an interim basis for a six-month period, prohibited most rental increases on rental residential units within the City.

The ordinance defined rental units as including "[a]ll dwelling units in the City of Los Angeles designed for rental use or actually rented at any time on or after June 1, 1977, including single family dwellings and *mobile homes,* together with the land and buildings appurtenant thereto, and all services, privileges, furnishings and facilities supplied in connection with the use or occupancy thereof, . . ." (L.A. Ord. No. 151,415, § 2, subd. E., italics added.)

The ordinance exempted "dwelling units located in a structure completed or newly constructed" after its effective date. (L.A. Ord. No. 151,415, § 2, subd. E(5).)

b. *The 1979 RSO.*

The moratorium was succeeded by the RSO (§ 151.00 et seq., L.A. Ord. No. 152,120) which became operative May 1, 1979 (§ 151.12).

Section 151.02, subdivision M, of the RSO defines rental units as including "mobile homes, whether rent is paid for the mobile home and the land upon which the mobile home is located, or rent is paid for the land alone."

Subdivision M(6), the crucial subdivision, exempts new construction, which it defines as "[h]ousing accommodations located in a structure for which a certificate of occupancy was first issued after October 1, 1978."

The purpose of the exemption was "to encourage new construction and expansion of the City's housing stock."[2]

3. *Trial court erred in holding the Park is not exempt new construction within the meaning of subdivision M(6).*

a. *Summary of argument.*

 The Park contends it first obtained a statement of installation acceptance in 1980, that such statement is analogous to a certificate of occupancy, and that a mobilehome park is analogous to a structure consisting of subdivided units. Based thereon, it is exempt as "[h]ousing accommodations

---

[2] As stated in a letter from the Community Development Department Rent Stabilization Division to Councilman Wachs, dated July 5, 1985.

located in a structure for which a certificate of occupancy was first issued after October 1, 1978." (Subd. M(6).)

The City contends, and the trial court held, that subdivision M(6)'s exemption for new construction did not exempt new mobilehome parks, and it was not until 1986 that the RSO created an exemption for new mobilehome parks.

### b. *Principles of statutory construction.*

■ The construction of a municipal ordinance is governed by the same rules as the construction of statutes. (*C-Y Development Co.* v. *City of Redlands* (1982) 137 Cal.App.3d 926, 929 [187 Cal.Rptr. 370].)

■ Ambiguity is generally a condition precedent to interpretation. (*County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 849, fn. 6 [59 Cal.Rptr. 609, 428 P.2d 593].) If the words of an enactment, given their ordinary meaning, are reasonably free from ambiguity, the courts will look no further to ascertain the meaning of the statute. (*People* v. *Mel Mack Co.* (1975) 53 Cal.App.3d 621, 626 [126 Cal.Rptr. 505].) ■ The literal meaning may be disregarded, however, to avoid absurd results or to give effect to manifest purposes that, in light of the statute's legislative history, appear from its provisions considered as a whole. (*County of Sacramento, supra,* at p. 849, fn. 6.)

■ Although courts ordinarily defer to the administrative interpretation of a statute adopted by the agency charged with its enforcement, such deference is not appropriate where, as here, the administrative interpretation occurs in an *internal memorandum,* rather than in an administrative regulation which is adopted after notice and hearing. (*Jones* v. *Tracy School Dist.* (1980) 27 Cal.3d 99, 107 [165 Cal.Rptr. 100, 611 P.2d 441]; *California State Employees' Assn.* v. *State Personnel Bd.* (1986) 178 Cal.App.3d 372, 380 [223 Cal.Rptr. 826].)

■ "In any event, administrative construction of a statute, while entitled to weight, cannot prevail when a contrary legislative purpose is apparent. [Citations.]" (*Pacific Legal Foundation* v. *Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 117 [172 Cal.Rptr. 194, 624 P.2d 244].)[3]

---

[3] Further, the record reflects the City's Community Development Department Rent Stabilization Division sought an opinion from California Department of Housing and Community Development as to the application of subdivision M(6) to a particular mobilehome park.

General counsel responded in a letter dated September 23, 1982, stating he could not "definitively advise the City on the interpretation of its Ordinance." Counsel concluded "the

### c. *Mobilehomes are "housing accommodations located in a structure."*

■ Health and Safety Code section 18211, found within the Mobilehome Parks Act (Health & Saf. Code, § 18200 et seq.), provides: "'Mobilehome', for the purposes of this part, is a *structure* transportable in one or more sections, designed and equipped to contain not more than two dwelling units, . . . , to be used with or without a foundation system." (Health & Saf. Code, § 18211, italics added.) Health and Safety Code section 18008 contains a similar definition.

In *Pacific Gas & Elec. Co.* v. *Hacienda Mobile Home Park* (1975) 45 Cal.App.3d 519, 525 [119 Cal.Rptr. 559], a deed of easement prohibited the construction of "'any building or other structure'" within 15 feet of any line of poles and wires. The operator of a mobilehome park contended that mobile homes were not prohibited "'buildings or structures'" under the deed. (*Id.*, at p. 526.)

At that time, Health and Safety Code section 18211 defined mobilehome as "'a *vehicle* designed and equipped for human habitation, and for being drawn by a motor vehicle'"; Health and Safety Code section 18008 similarly defined mobilehome as "'a *vehicle* designed and equipped to contain not more than two dwelling units to be used without a permanent foundation'" (*Pacific Gas & Elec. Co., supra,* 45 Cal.App.3d at p. 526, both italics added). The reviewing court held these definitions did not preclude a mobilehome from being a building or structure. (*Id.*, at p. 527.) It also looked to case law which had defined, for various purposes, a phone booth, a cabin cruiser, a railroad car and a popcorn stand on wheels, as structures. (*Ibid.*) The *Pacific Gas & Elec. Co.* court concluded a mobilehome or trailer was a building or structure as those terms were used in the grant of easement. (*Ibid.*)

Thus, California's statutory and case law both recognize a mobilehome is a habitable structure. Accordingly, we conclude a mobilehome is a structure within the meaning of subdivision M(6).

It has been argued that for the Park to come within the exemption for "accommodations located in a structure" (subd. M(6)), the individual mobilehomes are the "accommodations" and the park in which the mobilehomes are situated must be regarded as the "structure."

---

effect of issuance of a 'certificate of occupancy' for conventional homes is approximately the same as that of a 'permit to operate' for mobilehome parks," but it was unclear whether subdivision M(6) was intended to be read literally.

The above further undermines the City's contention that its administrative interpretation is entitled to great weight.

This argument rests on a misreading of "accommodations." Subdivision M(6)'s use of "accommodations" instead of "accommodation" is without import, as the plural form is usually used to refer to lodging. (See, e.g., Webster's Third New Internat. Dict. (1986 unabridged) p. 12; Random House College Dict. (1984 ed.) p. 9.) It therefore follows that each individual mobilehome constitutes "accommodations located in a structure" within the meaning of subdivision M(6).

Separately, the City argues the "accommodations located in a structure" test is not met because the Park's tenants own their mobilehomes and merely lease their sites. Because section 151.02, subdivision M, provides the RSO extends to mobilehomes where rent is paid for the land alone, and subdivision M(6) exempts accommodations which were first approved for occupancy after October 1, 1978, the argument lacks merit.

d. *Statement of installation acceptance and certificate of occupancy are synonymous.*

The City argues subdivision M(6), by its terms, is unavailing to the Park for the additional reason that mobilehomes receive statements of installation acceptance, not certificates of occupancy. The purported distinction is unpersuasive because the two certifications are functionally equivalent. Moreover, the City's semantic argument is defeated by California Code of Regulations, title 25, section 1366, which is captioned: "Statement of Installation Acceptance (Certificate of Occupancy)." (As amended, Aug. 22, 1985, Register 85, No. 36 (Sept. 7, 1985).)

Essentially, the regulation provides that after final inspection of a mobilehome installation, the enforcement agency shall issue a statement of installation acceptance. This regulation applies both to mobilehomes installed on foundations systems or on individual load bearing supports. (Cal. Code Regs., tit. 25, § 1366, subd. (a)(6)(A), (B).)

Thus, a statement of installation acceptance serves the same function as a certificate of occupancy and the applicable statewide regulation treats the two approvals as synonymous. Accordingly, the reference in subdivision M(6) to certificates of occupancy necessarily encompasses mobilehomes receiving statements of installation acceptance.

Further, it would appear the sole reason the ordinance refers to the certification process, and specifies an approval date, is to ensure that only newly created housing is exempt from the RSO.

4. *Reading subdivision M(6) as exempting mobilehomes certified for occupancy after October 1, 1978, does not render subsequent amendments to RSO ineffective.*

 As indicated, the trial court held that if subdivision M(6) were construed to exempt mobilehomes certified for occupancy after October 1, 1978, a 1984 amendment to the RSO would be rendered partially ineffective, and a 1986 amendment would be surplusage. Our reading of said amendments leads to a contrary conclusion.

a. *The 1984 amendment.*

Section 151.06, "AUTOMATIC ADJUSTMENTS," specifies the conditions under which the maximum rent for a rental unit may be increased without permission of the rent adjustment commission or the community development department.

A 1984 amendment to section 151.06 added subdivision F (subd. F), which authorizes an automatic adjustment "[f]or a rental unit, which is the site within a mobilehome park (hereafter 'site') on which a mobilehome is located and is vacated by all the tenants after the operative date of this subsection; [¶] 1. Except as otherwise provided in this subsection, if the mobilehome on the site is vacated voluntarily or as a result of an eviction or termination of tenancy . . . , and the mobilehome is permanently removed from the site, then the maximum rent or maximum adjusted rent may be increased to any amount upon the re-rental of the site. Thereafter, as long as the site continues to be rented to one or more of the same persons, no other rent increase shall be imposed pursuant to this subdivision. [¶] However, this subdivision shall not apply in the following circumstances: [¶] a. If the mobilehome has been temporarily removed for repairs; or [¶] b. If the mobilehome has been replaced with a new mobilehome that one or more of the same tenants will occupy." (Added by L.A. Ord. No. 158,891, eff. June 4, 1984.)

In sum, subdivision F deals with automatic rent increases and vacancy decontrol. Because subdivision M(6) exempts new mobilehomes from the RSO, it does not overlap with subdivision F, which applies to the older housing stock.

b. *The 1986 amendment.*

In 1986, subdivision M(12) was added to section 151.02 as an additional category of exempt rental units. (Added by L.A. Ord. No. 160,791, eff. February 10, 1986.)

Subdivision M(12) exempts: "Any mobilehome park for which a permit to operate is defined in Chapter 4 of Part 2.1 of Division 13 of the California Health and Safety Code was first issued on or after the effective date of this amendment (hereafter 'existing park'). If acreage is added to a mobilehome park which park obtained a permit to operate prior to the effective date of this amendment, then any site located on such additional acreage shall be exempt from the provisions of this Chapter. Any new home sites created within the boundaries of an existing park through increased density or elimination of open space shall not be subject to this exception."

Subdivision M(12) is not surplusage. It represents a change in the law from subdivision M(6) with respect to mobilehomes. Subdivision M(6) exempted *individual* mobilehomes which were certified for occupancy after October 1, 1978.

Subdivision M(12) exempts mobilehome *parks* which obtained an operating permit after February 10, 1986. It also exempts sites located on acreage which is added to an existing park. The exemption of subdivision M(12) does not apply to sites which are created by increasing density in an existing park. It remains to be determined whether sites created through increased density remain exempt pursuant to subdivision M(6). Suffice it to say the adoption of subdivision M(12) is not rendered an idle act by our interpretation of subdivision M(6).

5. *Remaining contentions not reached.*

In view of the above, it is unnecessary to reach the Park's constitutional arguments or any other issues.

CONCLUSION

▓▓▓▓ The community development department's internal interpretation of subdivision M(6) is not entitled to deference, and in any event the construction of the ordinance ultimately is a question of law for the reviewing court.

▓▓▓▓ Because California law recognizes mobilehomes are habitable structures, mobilehomes are "[h]ousing accommodations located in a structure" within the meaning of subdivision M(6). Statements of installation acceptance and certificates of occupancy are functionally equivalent and the California Code of Regulations regards the two certifications as synonymous. Thus, under subdivision M(6), mobilehomes which were certified for occupancy after October 1, 1978, are exempt from the RSO.

Because the RSO extends to mobilehome tenancies where rent is paid for the land alone, subdivision M(6) extends to leased sites on which an installation was first approved after October 1, 1978.

 This interpretation does not render ineffective the 1984 and 1986 amendments to the RSO dealing with mobilehomes: The 1984 amendment governs older, nonexempt mobilehomes. The 1986 amendment established an exemption for new mobilehome parks, as contrasted with individual mobilehomes.

Lastly, our determination that mobilehomes certified for occupancy after October 1, 1978, are exempt from the RSO is entirely consistent with the obvious purpose of subdivision M(6) to encourage the construction of new rental units in order to expand the City's stock of affordable housing.[4, 5]

## DISPOSITION

The judgment is reversed.

The Park to recover costs on appeal.

Danielson, J., and Croskey, J., concurred.

A petition for a rehearing was denied October 17, 1989, and the opinion was modified to read as printed above. Respondent's petiton for review by the Supreme Court was denied December 13, 1989.

---

[4] The clerk's transcript discloses that between 1978 and 1986, five new mobilehome parks with five hundred and thirty-three spaces were permitted in the City.

[5] On September 13, 1989, the Governor signed Senate Bill No. 1241, which exempts from local rent control ordinances any newly contructed mobilehome spaces first rented after January 1, 1990.